ORIGINAL

FILED
JUL 5 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YVONNE GARREAUX

v.

THE UNITED STATES

COMPLAINT

No: 06-502 C

## JURISDICTION

1. Jurisdiction and the payment of money damages is established in this Court pursuant to the 1868 Fort Laramie Treaty, Article I, entered into between the Great Sioux Nation and the United States Government and codified at 15 Stat. 635.

2. The Plaintiff is an enrolled member of the Cheyenne River Sioux Tribe and resides within the exterior boundaries of the reservation. Thus, the Plaintiff's right to sue the United States and demand the payment of money damages is protected by her membership in the Cheyenne River Sioux Tribe.

3. The Plaintiff has been damaged by actions of the United States government through their agents within the Department of Housing and Urban Development (hereinafter HUD) and the Department of the Interior, Bureau of Indian Affairs (hereinafter BIA).

## FACTUAL BACKGROUND

4. HUD entered into a lease agreement with certain Indian heirs of land held in trust for them by the United States. This lease agreement, numbered 72-192, was entered into on September 21, 1977 and was approved by the BIA on October 27, 1977. (See Exhibit A Attached)

5. The term of the lease was for twenty-five (25) years on 2.5 acres of land within the S1/2SW1/4SW1/4SE1/4NE1/4, S1/2SE1/4SE1/4SW1/4NE1/4, Sec 26, T. 14. N., R. 28 E. in Dewey County, State of South Dakota.

6. The land was to be used by HUD in order to build a Mutual Help Home pursuant to the United States Housing Act of 1937.

7. According to provision five of the lease agreement, HUD has a renewable twenty-five (25) year long lease as long as HUD maintains an economic interest in the project.

8. A Mutual Help Home was thus built upon the leased property and was occupied by one of the family members that agreed to the lease agreement.

9. The home built was Mutual Help unit no. 1035-02 of project SD005-15 which is located on the above described 2.5 acres of land.

10. The original occupant of the home then failed to make payments on the home and the home was turned over the Cheyenne River Housing Authority (hereinafter Housing Authority) to administer as a Mutual Help home under the auspices of the HUD Mutual Help program.

11. The Housing Authority was created by and pursuant to the United States Housing Act of 1937 and the Indian Housing Act of 1988.

12. The Mutual Help Homeownership Opportunity Program was created by the United States government and was administered by HUD.

13. The local Housing Authority was an agent of HUD for the Mutual Help Homeownership program as HUD's regulations permit a tribal government to create an Indian Housing Authority.

14. The Housing Authority was thus allowed to develop, own, and operate housing projects under HUD's supervision and in accordance with HUD regulations. The Indian Housing Act gave HUD substantial oversight over Tribal Housing Authorities when building and administering Mutual Help Program homes.

15. After the home had passed through two different owners, the Housing Authority then entered into a Mutual Help and Occupancy Agreement (hereinafter MHOA) with the above named plaintiff for the sale and purchase of Mutual Help unit no. 1035-02.

16. The Housing Authority has since lost the original MHOA and cannot produce the document to the plaintiff.

17. The Plaintiff, an elderly American Indian person, was told at that time that the MHOA would provide a means by which she could own her own home.

18. It was the understanding of the Plaintiff, as told to her by Housing Authority agents, that she would own the home at the completion of her agreement with the Housing Authority.

19. At the time the Plaintiff took possession of the home in 1992 the home was in severe disrepair. The home needed a substantial amount of repair in order to bring the home up to a safe and habitable standard.

20. At the time of entering into the MHOA with the Plaintiff the Housing Authority promised to repair the damages to the home, which were and are significant.

21. As of March of 2005, the estimated value of repairs that are needed for the home to meet a safe and habitable standard is $40,935.40. (See Attached Exhibit B)

22. In March of 2005, the Housing Authority admitted that they never repaired the home and that the amount to repair to the home is an outstanding obligation of the Housing Authority.

23. The home has been in such a state of disrepair that it is very cold during the winter forcing the plaintiff to heat her home by using the oven stove.

24. The Plaintiff has had to install a wood burning stove in the home in order to assist in the heating of the home.

25. At the time of occupancy several of the heating base boards did not function. Now, after thirteen years of occupancy almost all of them no longer function and have not been repaired by Housing Authority.

26. The basement frames of the home are so rotted that the Plaintiff has had to "stuff" them in order to winterize the house.

27. The estimated amount of damages of $40,935.40 for repairs to the home is almost equal to the recent estimated value of the home itself. (See Attached Plaintiff's Exhibit C)

28. As of October 2004, the Plaintiff completed her obligations under the MHOA and the Housing Authority approved the conveying of their interests in the house to the Plaintiff. At that time the Plaintiff was told she would receive her house and would have the right to continue to occupy and use her home. (See Attached Exhibit D)

29. In October 2004, the Housing Authority approved the conveying of the house to the Plaintiff. At that time, however, the conveyance did not take place as the Plaintiff has not made her final payment to transfer the land.

30. After the Housing Authority entered into the process of conveying the house, the BIA Agency Superintendent for the Cheyenne River Agency contacted the Plaintiff on December 10, 2004. The Superintendent informed her that the majority interest holders in the leased land were requesting that she move her house and leave the land. The Superintendent stated that since HUD no longer had an economic interest in the land the lease was thus terminated. (See Attached Exhibit E)

31. The Superintendent at that time gave the Plaintiff a thirty (30) day notice to leave the premises.

32. The Plaintiff then contacted the Housing Authority to complain and request assistance on this matter.

33. Housing Authority then contacted the BIA Superintendent and informed him that the Housing Authority still had an interest in the home. Thus, the home still had not been conveyed to the Plaintiff and that it was premature to bring an eviction proceeding against the Plaintiff.

34. In response to Housing Authority's argument the Superintendent sent a letter on March 14, 2005 to the Housing Authority's attorney, Rebecca Kidder, agreeing that since the final payment was not made and because of the outstanding repairs to the home the BIA agreed that HUD still maintained a financial interest in the home. The lease would carry on thus until such time as Housing Authority actually conveys the home to the Plaintiff or until they waive, cancel or settle the dispute over the outstanding repairs that are needed to the home. (See Attached Exhibit F)

35. After receiving this letter from the BIA Superintendent the Housing Authority entered into settlement negotiations with the plaintiff.

36. The Plaintiff cannot reside in the home which she purchased since the lease is not being renewed on the land upon which the home was built by HUD/Housing Authority.

37. The Housing Authority acknowledged that it owed the Plaintiff an outstanding debt of $40,935.40 in March of 2005 for the repairs that were never completed on the home since 1992.

38. The Housing Authority then authorized entering into settlement negotiations with the Plaintiff to resolve the situation with the Plaintiff's house.

39. Negotiations began in March of 2005 with an offer to the move the home.

40. Later on the offer to move the home was revoked by the Housing Authority since they did not have the necessary funding to move the home.

41. The Housing Authority then offered to credit the Plaintiff with the cost of the home plus the claim for outstanding repairs that were not done to the home.

42. In October, 2006 the Housing Authority completed an appraisal of the Plaintiff's home and valued the home at $44,000.00. (See Attached Exhibit C)

43. The replacement home that the Housing Authority offered as part of a settlement agreement was valued at more than what the Housing Authority is willing to credit the Plaintiff. Thus, in order for the Plaintiff to have a new home the Plaintiff would have to take out an additional mortgage to cover the new home.

44. The home would also not be the same as the home which the Plaintiff bargained for in the initial MHOA.

45. The new home offered by the Housing Authority would be in the town of Eagle Butte, South Dakota and not in the country. The home would also not have a basement.

46. During the course of the negotiations the Plaintiff's health has significantly decreased due to the stress caused by the Plaintiff's housing situation.

47. The stress and poor housing conditions which the Plaintiff has had to suffer has further exacerbated her many medical conditions, including diabetes and poor eye sight.

48. The BIA Superintendent has been aware of the Plaintiff's housing situation since December 2004 and has failed to provide any ultimate remedy to the case.

49. Furthermore, it is the BIA position to support the owners of the trust property because of the BIA trust responsibility.

50. The BIA Superintendent and the BIA realty have offered no support or assistance in attempting to remedy the situation. Indeed, the BIA Superintendent was the individual who signed the letter attempting to remove the plaintiff from her home.

51. A Federal Tort Claims Act Administrative Complaint was filed in February 2005 against the BIA and HUD. A final administrative determination as to the tort claims at issue in this case has not been finally made by either agency.

52. In May 2006, the negotiations with Housing Authority came to a halt as the Housing Authority had still not offered any settlement that was suitable to the Plaintiff.

## CAUSE OF ACTION

1. The United States Government has committed a wrong pursuant to Article I, of the 1868 Fort Laramie Treaty, 15 Stat. 635., by committing or failing to act in the following manner:
2. HUD failed to properly administer the Mutual Help Homeownership Opportunity Program and failed to assure that the Mutual Help home at issue was transferable.
3. HUD failed to have proper oversight over the Housing Authority according to HUD's regulations. Thus, HUD's failure to provide appropriate oversight over the Housing Authority's Mutual Help Homeownership program lead to the Plaintiff purchasing a home upon land which she cannot own.
4. In addition, HUD failed to provide oversight in the maintenance and construction of the home. The Plaintiff thus had to live in a severely damaged home that was in a state of disrepair for over 13 years.
5. By failing to properly administer and provide over sight of the Housing Authority's actions a Mutual Help Home was built and transferred to an individual that cannot have an interest in the land upon which the home sits thus nullifying any home transfer to the Plaintiff.
6. HUD's lack of oversight of the Mutual Help Program has lead to the Plaintiff losing the home which she paid for and agreed to purchase.
7. HUD's action/inaction has relegated the Plaintiff to living in squalor for the past 13 years.
8. HUD's lack of agency action/inaction has breached the contract with the Plaintiff, thus causing the Plaintiff to lose her home.

9. The BIA's action/inaction in administering the underlying lease agreement on the trust property injured the Plaintiff, thus causing her to lose her home.
10. BIA's negligence in administering the lease on trust property has caused the Plaintiff to lose her home and to breach the contract with HUD.
11. The BIA Superintendent has failed to provide any administrative remedy to cure the breach of the MHOA and the actions/inactions of HUD and the BIA.
12. Based upon the reasons listed above the plaintiff has been "wronged" by "bad men" under Article I, of the 1868 Fort Laramie Treaty. The Plaintiff can and is thus demanding payment for damages done to the person and property of the Plaintiff pursuant to Article I of the Treaty.

Wherefore, the plaintiff prays this Court to:

A. Enter a judgment against the defendant the United States in the amount of $500,000.00 for actual and compensatory damages for the breach of the MHOA Agreement
B. Enter a judgment against the defendant the United States in the amount of $250,000.00 for failure to properly administer the MHOA and supporting regulations.
C. Enter a judgment against the United States in the amount of $300,000.00 for failing to provide safe, sanitary and healthy living conditions as mandated under the Indian Housing Act.
D. Enter a judgment against the United States for negligence in the administration and breach of the MHOA contract in the amount of $300,000.00.

E. For such further relief that the Court deems just and necessary.

Dated this 27th day of June, 2006.

Robert J. Doody
Attorney for the Plaintiff
Dakota Plains Legal Services
PO Box 500
Eagle Butte, SD 57625
(605) 964-2175

DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs

Lease No. 72-192
Document No.
340 24548

LEASE
(Public Housing Project)

THIS LEASE, made and entered into this 21st day of September, 1977, by and between the heirs of Thomas J. Veo, CR-5317

hereinafter called the "LESSOR," and the Cheyenne River Housing Authority, hereinafter called the "LESSEE." This lease shall be subject to the approval of the SECRETARY OF THE INTERIOR, or his authorized representative.

WITNESSETH:

The parties hereto for the consideration hereinafter mentioned do covenant and agree as follows:

1. PREMISES. The Lessor hereby leases to the Lessee the following real property situated described as follows:

S½SW¼SW¼SE¼NE¼, S½SE¼SE¼SW¼NE¼ sec. 26, Twp. 14 N., R. 28 E., containing 2.5 acres.

The above property will comprise approximately One (1) Mabel V. Blackbird dwelling sites.

2. USE OF PREMISES. The premises shall be used for the purpose of constructing and operating a Public Housing Project, and its appurtenances, known as Project SD 5-11 with the financial assistance of the Department of Housing and Urban Development, hereinafter called "HUD", under the provisions of the United States Housing Act of 1937, 50 Stat. 888, as amended, and for such other purposes, not inconsistent with the foregoing, as may be approved by the Lessor and HUD.

3. TERM. Lessee shall have and hold the described premises with their appurtenances for term of 25 years beginning on the date first above written. This lease shall automatically and without notice renew for an additional term of 25 years on the same terms and conditions contained herein. This lease may not be terminated by either or both parties during the initial or renewal term of the lease without the consent of HUD or until HUD interest in the project has been terminated.

4. CONSIDERATION FOR LEASE. In consideration of the Lessor entering into the lease, the Lessee shall pay the Lessor for use of the premises rent at the rate of one dollar ($1.00) for each 25 year term, payment to be made for each term in advance. It is agreed that there shall be no adjustment of these payments in the event that any part of the leased premises is taken by condemnation for highway or other public purposes. It is further agreed that this lease or any part thereof including this paragraph shall not be construed to prejudice the rights or impair the prosecution of any claim of the Lessee arising out of such condemnation proceeding.

PLAINTIFF'S EXHIBIT
A

340 24548

. *ASSIGNMENTS.* This lease shall no ...the ...se be assigned, in whole or in part, wi... ...t the prior written consent of the Lessor or Secretary of the Interior and, during the period HUD has a financial interest in the project, HUD, provided, that, the Lessee may assign this lease or deliver possession of the premises to the United States of America in the event of the issuance of a Notice of Substantial Default or Substantial Breach of any financial assistance contract between the Lessee and the United States of America. Nothing in this lease shall prevent the Lessee from executing and recording a mortgage and/or declaration of trust as may be necessary and appropriate under any such Federal financial assistance contract with the Lessee with respect to all or any part of the premises.

. *SUBLEASES.* The Lessee is hereby authorized to make subleases and assignments of its leasehold interests in connection with development and operation of a Public Housing Project. During the term of any sublease, should the participant be or become an owner of the land it is hereby agreed that a merger of interest shall not occur.

. *IMPROVEMENTS.* All improvements shall be made and remain the property of the Lessee or its assigns until the expiration of the lease. All such improvements shall become the property of the Lessor at the expiration of this lease.

. *INSURANCE.* Lessee shall obtain and pay for owners', landlords', and tenants' public liability insurance, excluding property damage, in amounts acceptable to the Lessor and HUD. It is understood and agreed that the term *OWNERS* " includes both the United States and the Lessor. The Lessee and its assigns shall hold the the Lessor and the United States harmless from any claim of whatsoever nature arising out of use or occupancy of the premises.

. *RELINQUISHMENT OF SUPERVISION BY THE SECRETARY OF THE INTERIOR.* Nothing contained in this lease shall operate to delay or prevent a termination of Federal trust responsibilities with respect to the land by the issuance of a fee patent or otherwise during the term of the lease; however, such termination shall not serve to abrogate the lease. The owners of the land and the Lessee shall be notified by the Secretary of any such change in the status of the land.

10. *SHARE OF BENEFIT FROM LEASE.* No member of Congress or any delegate thereto or any resident Commissioner shall be admitted to any share or part of this lease or to any benefit that may arise herefrom.

11. *VIOLATIONS OF LEASE.* It is understood and agreed that violation of this lease shall be acted upon in accordance with the regulation in 25 CFR 131.

12. *QUIET ENJOYMENT.* Lessor agreed to defend the title to the leased premises and also especially agrees that Lessee and its tenants shall peaceably and quietly hold, enjoy and occupy the leased premises for the duration of this lease without any hindrance, interruption, ejection or molestation by Lessor or by any other person or persons whomsoever.

. *SURRENDER OF POSSESSION.* If upon expiration or other termination of this lease, further use rights are not granted to the Lessee or its assigns by the Lessor, said Lessee or its assigns shall, upon demand, surrender to the Lessor complete and peaceable possession of the premises.

. *UNLAWFUL CONDUCT.* The Lessee agrees not to use or cause to be used any part of said premises for any unlawful conduct or purposes.

. *ASSENT NOT WAIVER OF FUTURE BREACH OF COVENANTS.* No assent, express or implied, to any breach of any of the Lessee's covenants, shall be deemed to be a waiver of any succeeding breach of any covenants.

. *UPON WHOM BINDING.* It is understood and agreed that the covenants and agreements hereinbefore mentioned shall extend to and be binding upon the heirs, assigns, successors, executors, and administrators of the parties of this lease. While the leased premises are in trust or restricted status, all of the Lessee's obligations under this lease, and the obligations of its sureties, are to the United States aswell as to the Lessor.

7. *APPROVAL.* It is further understood and agreed between the parties hereto that this lease shall be valid and binding only after approval by the Secretary of the Interior, or his authorized representative.

Mar. 1978

*FOR INDIVIDUALLY OWNED LAND:*

In Witness Whereof, the parties hereto have hereunto set their hands on the date first above written.

| | |
|---|---|
| WITNESS | Evelyn Bartlett (lessor) |
| WITNESS | Herbert A. Veo LESSOR |
| WITNESS | Kirby G. Veo LESSOR |
| WITNESS | Thomas Veo, Jr. LESSOR |
| WITNESS | Terrance C. Veo LESSOR |
| WITNESS | Leon M. Veo LESSOR |
| WITNESS | |
| WITNESS | |
| WITNESS | |
| WITNESS | |

CHEYENNE RIVER
HOUSING AUTHORITY, LESSEE

Kenneth West CHAIRMAN

Eunice Larrabee SECRETARY

Bureau of Indian Affairs
Aberdeen Area Office
Aberdeen, South Dakota
Pursuant to authority delegated by
Secretarial Order 2508 (14 F.R. 258)
and 10 BIAM 3 (34 F.R. 637)

The within lease is hereby approved: OCT 27 1977

(Sgd) Harley D. Zephier

SECRETARY OF THE INTERIOR
AREA DIRECTOR

(Authority:

RECORDED
B.I.A.
OCT 28 2 04 PM '77
ABERDEEN
AREA OFFICE
340 24548

**Cheyenne River Housing Authority**
P. O. Box 480
Eagle Butte, SD 57625

605-964-4265 Phone
605-964-1070 Fax

March 3, 2005

To: Cheyenne River Housing Authority Board of Commissioners

Fr: Doug Dupris, Maintenance Director

Re: Cost estimates of materials and labor for Unit # 1035, Yvonne Garreau

| Repairs | LABOR | MATERIAL |
|---|---|---|
| Remove Existing floor tile | $236.40 | $0.00 |
| Renail loose underlayment, replace damaged underlayment, fill and sand. | $156.00 | $216.00 |
| Install 112 SQ. YDS. Linoleum | | |
| Adhesives for linoleum | | $165.60 |
| Replace 390 L.F. baseboard | $1,087.20 | $1,604.40 |
| Clean and prepare walls and ceilings for painting | $218.40 | $62.40 |
| Texture, prime, and paint walls and ceilings | $326.40 | $186.00 |
| Replace windows with Marvin EZ tilt windows and Apline storm combinations | $535.60 | $3,806.40 |
| Replace 200-L.F. window casing | $204.00 | $163.20 |
| Replace (2) exterior doors and locks | $90.00 | $513.60 |
| Replace (2) storm doors | $90.00 | $435.60 |
| Replace existing siding with insulated sheathing, tyvek house wrap, and steel siding | $1,890.00 | $4,953.60 |
| Install new steel roof | $1,400.00 | $2,600.00 |
| Install 3 GFI receptacles | $33.60 | $56.40 |
| Replace (5) door stops | $26.24 | $21.60 |
| Replace (8) light fixtures | $180.00 | $240.00 |
| Replace kitchen cabinets | $324.00 | $2,200.00 |
| Replace the countertop | $55.00 | $226.00 |
| Replace sink faucet and P-trap | $65.00 | $160.00 |
| Replace range | $33.60 | $372.00 |
| Replace Refrigerator | $33.60 | $363.00 |



PLAINTIFF'S EXHIBIT
B

| | | |
|---|---|---|
| Replace (5) interior doors | $198.00 | $510.00 |
| Replace range hood | $33.60 | $87.60 |
| Replace bath exhaust fan | $43.20 | $81.60 |
| Replace vanity sink, faucet, drain, and shut offs | $45.60 | $110.40 |
| Replace interior door casing | $324.00 | $303.60 |
| Replace electrical baseboard heat with LP furnace with ductwork | $1,490.40 | $2,616.00 |
| Install 1,000 Gal .LP tank and supply line | $230.40 | $1,874.40 |
| Install black pipe LP service to furnace, range, and hot water heater | $158.40 | $76.80 |
| Remove existing baseboard heaters, rewire as necessary and patch walls | $268.00 | $76.80 |
| Replace (1) stairs tread | $14.40 | $6.00 |
| Relevel North stairwell suspended beam, trim 4/4 post and 2/6 upright | $79.20 | $0.00 |
| Replace (4) basement windows | $140.00 | $344.00 |
| Replace guy gray box and laundry spigots | $39.60 | $51.60 |
| Replace hot water heater | $102.00 | $318.00 |
| Relevel main beam | $108.00 | |
| Replace flue storm collar | $9.06 | $16.80 |
| Replace soffit and Fascia | $237.60 | $276.00 |
| Caulk all utility entries | $26.40 | $20.40 |
| Reset splash blocks | $26.40 | $0.00 |
| Replace deck | $600.00 | $1,100.00 |
| Reset cong. Block walk | $74.40 | $0.00 |
| Regrade around foundation | $0.00 | $780.00 |
| Replace (2) wall hydrants | $55.20 | $33.60 |
| Replace (2) porch light fixtures | $39.60 | $48.00 |
| Replace door bell buttons | $12.00 | $8.40 |
| Paint clothesline poles | $16.80 | $21.60 |
| Replace dryer wall cap | $24.00 | $10.80 |
| Replace commode | $63.60 | $74.40 |
| Install propane leak detector | $46.80 | $198.00 |
| LP gas (heat) and electricity | | $679.20 |
| Replace washer hook up and copper line | $125.00 | $85.00 |
| SUBTOTAL | $11,636.70 | $28,154.80 |
| Mileage at 62 miles per round trip from Eagle Butte x 45 trips @ .41 per mile | $1,143.90 | |
| Total materials and labor | $39,791.50 | |
| Grand total | $40,935.40 | |

**AMERICAN VALUES**
**REAL ESTATE APPRAISAL**

File No. hwy 212 La piant

APPRAISAL OF



LOCATED AT:

HIGHWAY 212
LA PLANT, SD 57625

FOR:

CHEYENNE RIVER HOUSING AUTHORITY
PO BOX 590 EAGLE BUTTE, S.D. 57625
HOUSTON, TX 77036

BORROWER:

GARREAU

AS OF:

June 10, 2005

BY:

CHEV HACKETT

PLAINTIFF'S
EXHIBIT
C

**AMERICAN VALUES**
**REAL ESTATE APPRAISAL**

File No. hwy 212 La plant

AUGUST 17, 2005

CHEYENNE RIVER HOUSING AUTHORITY
PO BOX 590 EAGLE BUTTE, S.D. 57625
HOUSTON, TX 77036

File Number: hwy 212 La plant

In accordance with your request, I have personally inspected and appraised the real property at:

HIGHWAY 212
LA PLANT, SD 57625

The purpose of this appraisal is to estimate the market value of the subject property, as improved. The property rights appraised are the leasehold interest in the site and improvements.

In my opinion, the estimated market value of the property as of June 10, 2005 is:

***$44,000***
***Forty-Four Thousand Dollars***

The attached report contains the description, analysis and supportive data for the conclusions, final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.

SINCERELY,

CHEV HACKETT

AMERICAN VALUES

Property Description

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. hwy 212 La plant

**SUBJECT**

Property Address HIGHWAY 212 | City LA PLANT | State SD | Zip Code 57625

Legal Description See Attached Addendum | County DEWEY

Assessor's Parcel No. N/A | Tax Year N/A | R.E. Taxes $ N/A | Special Assessments $ N/A

Borrower GARREAU | Current Owner GARREAU | Occupant: [X] Owner [ ] Tenant [ ] Vacant

Property rights appraised [ ] Fee Simple [X] Leasehold | Project Type [ ] PUD [ ] Condominium (HUD/VA only) | HOA$ N/A /Mo.

Neighborhood or Project Name LA PLANT | Map Reference FLOODINSIGHTS | Census Tract N/A

Sale Price $ REFINANCE | Date of Sale 6/2005 | Description and $ amount of loan charges/concessions to be paid by seller N/A

Lender/Client CHEYENNE RIVER HOUSING AUTHORITY | Address PO BOX 590 EAGLE BUTTE, S.D. 57625, HOUSTON, TX 77036

Appraiser CHEV HACKETT | Address 12955 BOGUS JIM ROAD RAPID CITY, S.D. 57702

**NEIGHBORHOOD**

| | | | | Predominant occupancy | Single family housing PRICE $(000) | AGE (yrs) | Present land use % | | Land use change |
|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [ ] Suburban | [X] Rural | | | | One family | 50% | [X] Not likely [ ] Likely |
| Built up | [ ] Over 75% | [X] 25-75% | [ ] Under 25% | [X] Owner | 20 Low | NEW | 2-4 family | 5% | [ ] In process |
| Growth rate | [ ] Rapid | [ ] Stable | [X] Slow | [ ] Tenant | 100 High | 50 | Multi-family | 5% | To: |
| Property values | [ ] Increasing | [X] Stable | [ ] Declining | [X] Vacant (0-5%) | Predominant | | Commercial | 10% | |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply | [ ] Vacant (over 5%) | 40 | 35 | VAC | 30% | |
| Marketing time | [ ] Under 3 mos. | [X] 3-6 mos. | [ ] Over 6 mos. | | | | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: THE NEIGHBORHOOD BOUNDARIES WOULD BE CONSIDERED THE TOWN OF LAPLANT LOCATED ON THE CHEYENNE RIVER INDIAN RESERVATION IN DEWEY COUNTY.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): THE SUBJECT PROPERTY IS LOCATED IN THE CITY OF LAPLANT WITHIN THE NORTHEAST SECTION OF DEWEY COUNTY IN WESTERN SOUTH DAKOTA. APPEAL TO THE MARKET IS CONSIDERED AVERAGE FOR THIS LOCAL AREA OF SOUTH DAKOTA. THERE IS AVERAGE ACCESS TO MAJOR HIGHWAYS LEADING TO LOCAL SHOPPING DISTRICT. THE EMPLOYMENT STABILITY IN THIS AREA APPEARS TO BE AVERAGE FOR THE AREA BUT GENERALLY BELOW NATIONAL STANDARDS. THERE ARE LIMITED EMPLOYMENT OPPORTUNITIES ON THE CHEYENNE RIVER RESERVATION AND GENERALLY INVOLVE AGRICULTURE, SERVICE OR GOVERNMENT JOBS.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): MARKET CONDITIONS ARE CONSIDERED AVERAGE FOR THIS LOCAL MARKER AREA. PROPERTY VALUES, DEMAND/SUPPLY AND MARKETING TIME ARE BASED ON VERY LIMITED DATA REGARDING SALES ON THE CHEYENNE RIVER RESERVATION. COMPETING PROPERTIES WOULD APPEAR TO HOUSING UNITS OFFERED BY LOCAL AND FEDERAL HOUSING AUTHORITIES. FINANCING IS AVAILABLE WITH VA/FHA/HUD & CONVENTIONAL LOANS AVAILABLE. MORTGAGE RATES ARE ATTRACTIVE WITH A LARGE NUMBER OF LENDERS IN THE MARKETPLACE.

**PUD**

Project Information for PUDs (if applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)? [ ] YES [ ] NO

Approximate total number of units in the subject project N/A. Approximate total number of units for sale in the subject project N/A

Describe common elements and recreational facilities: N/A

**SITE**

Dimensions N/A | Topography GENTLE SLOPE

Site area N/A | Corner Lot [ ] Yes [X] No | Size AVERAGE FOR AREA

Specific zoning classification and description N/A | Shape RECTANGULAR

Zoning compliance [ ] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [X] No zoning | Drainage APPEARS ADEQUATE

Highest & best use as improved: [X] Present use [ ] Other use (explain) NO ZONING COMMON S.D. | View AVERAGE

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private |
|---|---|---|---|---|---|---|
| Electricity | [X] | 200 AMPS CB | Street | ASPHALT | [X] | [ ] |
| Gas | [X] | PROPANE | Curb/gutter | NONE | [ ] | [ ] |
| Water | [X] | RW | Sidewalk | NONE | [ ] | [ ] |
| Sanitary sewer | [ ] | SEPTIC | Street lights | NONE | [ ] | [ ] |
| Storm sewer | [ ] | N/A | Alley | NONE | [ ] | [ ] |

Landscaping AVERAGE

Driveway Surface GRAVEL

Apparent easements NONE APPARENT

FEMA Special Flood Hazard Area [ ] Yes [X] No

FEMA Zone X | Map Date 2/16/96

FEMA Map No. 465420 0003 F

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.): NO APPARENT ADVERSE EASEMENTS OR ENCROACHMENTS NOTED AT TIME OF INSPECTION. LOT SIZE IS SUPERIOR FOR AREA. TOPOGRAPHY & UTILITY ARE TYPICAL FOR THIS AREA. TITLE REPORT WAS NOT MADE AVAILABLE TO THE APPRAISER.

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | CONCRETE | Slab | NONE | Area Sq.Ft. | 0 | Roof | [ ] |
| No. of Stories | 1 | Exterior Walls | HARDBOARD | Crawl Space | NONE | % Finished | N/A | Ceiling UNK | [X] |
| Type (Det./Att.) | DET | Roof Surface | ASPHALT | Basement | CONCRETE | Ceiling | N/A | Walls UNK | [X] |
| Design (Style) | RANCH | Gutters & Dwnspts. | ALUMINUM | Sump Pump | NONE NOTED | Walls | N/A | Floor UNK | [ ] |
| Existing/Proposed | EXISTING | Window Type | DBL HUNG | Dampness | NONE NOTED | Floor | N/A | None | [ ] |
| Age (Yrs.) | 20 | Storm/Screens | N/A | Settlement | NONE NOTED | Outside Entry | N/A | Unknown | [X] |
| Effective Age (Yrs.) | 16 | Manufactured House | NO | Infestation | NONE NOTED | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | 0 |
| Level 1 | | 1 | | 1 | | | | 3 | 1 | | | 1,062 |
| Level 2 | | | | | | | | | | | | 0 |

Finished area above grade contains: 5 Rooms; 3 Bedroom(s); 1 Bath(s); 1,062 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | TILE/FAIR | Type | BASBRD | Refrigerator | [P] | None | [ ] | Fireplace(s) # | [ ] | None | [ ] |
| Walls | DRYWALL/FAIR | Fuel | ELECTRIC | Range/Oven | [P] | Stairs | [ ] | Patio NONE | [ ] | Garage N/A | # of cars |
| Trim/Finish | WOOD/FAIR | Condition N/A | | Disposal | [ ] | Drop Stair | [ ] | Deck NONE | [ ] | Attached | NONE |
| Bath Floor | TILE/FAIR | COOLING | | Dishwasher | [ ] | Scuttle | [X] | Porch COVERED | [X] | Detached | NONE |
| Bath Wainscot | FIBERGLASS/FAIR | Central | NONE | Fan/Hood | [X] | Floor | [ ] | Fence NONE | [ ] | Built-In | NONE |
| Doors | WOOD/ FAIR | Other | N/A | Microwave | [P] | Heated | [ ] | Pool NONE | [ ] | Carport | NONE |
| | | Condition N/A | | Washer/Dryer | [P] | Finished | [ ] | | | Driveway | GRAVEL |

**COMMENTS**

Additional features (special energy efficient items, etc.): COVERED PORCH ON FRONT ENTRY.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.: NO FUNCTIONAL OBSOLESCENCE OBSERVED. EXTERNAL OBSOLESCENCE TAKEN FOR MINIMAL MARKET IN THIS AREA. THE OVERALL CONDITION OF PROPERTY IS CONSIDERED FAIR WITH REPAIRS NEEDED. FAIR/ AVERAGE QUALITY OF CONSTRUCTION. THE AGE/LIFE METHOD OF DEPRECIATION HAS BEEN USED.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: NO VISUAL OBSERVANCE OF ADVERSE ENVIRONMENTAL CONDITION NOTED ON OR NEAR THE SITE AT TIME OF INSPECTION. RECOMMEND A HOME INSPECTION FOR COMPLETE EVALUATION OF THIS HOMES CONDITION.

AMERICAN VALUES

Valuation Section

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. hwy 212 La plant

**COST APPROACH**

| | |
|---|---|
| ESTIMATED SITE VALUE = $ | |
| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS: | |
| Dwelling 1,062 Sq. Ft. @ $ = $ | 0 |
| Sq. Ft. @ $ = | |
| = | |
| Garage/Carport Sq. Ft. @ $ = | 0 |
| Total Estimated Cost New = $ | 0 |
| Less Physical / Functional / External | Est. Remaining Econ. Life: |
| Depreciation = $ | 0 |
| Depreciated Value of Improvements = $ | 0 |
| "As-is" Value of Site Improvements = $ | |
| INDICATED VALUE BY COST APPROACH = $ | 0 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): (SEE ATTACHED SKETCH ADDENDUM FOR BUILDING MEASUREMENTS) COSTS WERE DERIVED FROM MARSHALL AND SWIFT RESIDENTIAL COST HANDBOOK WITH ADDITIONAL INFORMATION DERIVED FROM LOCAL BUILDERS. DEPRECIATION IS BASED ON THE AGE/LIFE METHOD. EXTERNAL TAKEN FOR MARKET CONDITIONS IN THIS AREA. SITE VALUE WAS NOT INCLUDED. (SEE ATTACHED MARSHALL & SWIFT REPORT)

**SALES COMPARISON ANALYSIS**

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| HIGHWAY 212 Address LA PLANT | | | | | | | |
| Proximity to Subject | | | | | | | |
| Sales Price | $ REFINANCE | | $ | | $ | | $ |
| Price/Gross Liv. Area | $ 0.00 ⌀ | $ 0.00 ⌀ | | $ 0.00 ⌀ | | $ 0.00 ⌀ | |
| Data and/or Verification Sources | PHYSICAL INSPECTION | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | N/A COSTS | | | | | | |
| Date of Sale/Time | 6/2005 | | | | | | |
| Location | Rural | | | | | | |
| Leasehold/Fee Simple | Leasehold | | | | | | |
| Site | N/A | | | | | | |
| View | AVERAGE | | | | | | |
| Design and Appeal | RANCH | | | | | | |
| Quality of Construction | AVERAGE | | | | | | |
| Age | 20 Years | | | | | | |
| Condition | FAIR | | | | | | |
| Above Grade Room Count (Total / Bdrms / Baths) | 5 / 3 / 1.00 | | | | | | |
| Gross Living Area | 1,062 Sq.Ft. | Sq.Ft. | | Sq.Ft. | | Sq.Ft. | |
| Basement & Finished Rooms Below Grade | 0 Sq.Ft. Unfinished | | | | | | |
| Functional Utility | AVERAGE | | | | | | |
| Heating/Cooling | ELECTRIC BASBI | | | | | | |
| Energy Efficient Items | STANDARD | | | | | | |
| Garage/Carport | NONE | | | | | | |
| Porch, Patio, Deck, Fireplace(s), etc. | PORCH NONE | | | | | | |
| Fence, Pool, etc. | NONE | | | | | | |
| | NONE | | | | | | |
| Net Adj. (total) | | [X] + [ ] - | $ 0 | [ ] + [ ] - | $ | [ ] + [ ] - | $ |
| Adjusted Sales Price of Comparable | | Gross: 0.0% Net: 0.0% | $ 0 | Gross: Net: | $ | Gross: Net: | $ |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.):

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | SEE ADDENDUM DEWEY ASSESSOR | | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: SEE ADDENDUM

INDICATED VALUE BY SALES COMPARISON APPROACH . . . $ N/A

INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier N/A = $ N/A

**RECONCILIATION**

This appraisal is made [X] "as is" [ ] subject to the repairs, alterations, inspections or conditions listed below [ ] subject to completion per plans and specifications.

Conditions of Appraisal: THIS APPRAISAL WAS MADE "AS IS" WITH NO CONDITIONS REQUIRED. APPRAISER ASSUMES NO UNUSUAL ADVERSE CONDITIONS EXISTS WITH REGARD TO THE SUBJECT PROPERTY. (CRHA USE ONLY)

Final Reconciliation: DUE TO THE FACT THERE IS A VERY LIMITED # OF COMPARABLE SALES FROM DEWEY COUNTY, THE SALES COMPARISON APPROACH WAS NOT USED. THE INCOME APPROACH WAS NOT CONSIDERED DUE TO THE PREDOMINATE OWNER OCCUPIED USE OF SINGLE FAMILY HOMES. THE COST APPROACH CARRIED THE MOST WEIGHT AND UTILIZED TO DETERMINE MARKET VALUE.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93 ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 6/10/2005 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 44,000.

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature [signature] | Signature [signature] [ ] Did [X] Did Not Inspect Property |
| Name CHEV HACKETT | Name THOMAS P. SMITH |
| Date Report Signed 08/26/2005 | Date Report Signed 08/26/2005 |
| State Certification # State | State Certification # State |
| Or State License # 931SR-2005 State SD | Or State License # 852SL-2005 State SD |



Produced using ACI software, 800-234-8727 www.aciweb.com

Polaroid Digital Solutions, Inc.

# ADDENDUM

| | |
|---|---|
| Borrower: GARREAU | File No.: hwy 212 La plant |
| Property Address: HIGHWAY 212 | Case No.: |
| City: LA PLANT | State: SD Zip: 57625 |
| Lender: CHEYENNE RIVER HOUSING AUTHORITY | |

**Legal Description**
S 1/2 SW 1/4 SW 1/4 SE 1/4 NE 1/4 S 1/2 SE 1/4 SE 1/4 SW 1/4 NE 1/4 SECTION 26 TOWNSHIP 14 N. , R. 28 E.

**Neighborhood Market Factors**
THE PRECEDING INFORMATION CONCERNING LOW HOUSING PRODUCTION ON NATIVE AMERICAN TRUST LANDS ALLUDES TO SEVERAL OF THE COMPLEXITIES ASSOCIATED WITH PROVIDING GOOD APPRAISALS IN THESE AREAS. REMOTE LOCATION, REDUCED MARKET, LEGAL ISSUES AND VARIOUS ECONOMIC CONSTRAINTS ARE READILY APPARENT ON MANY TRUST LANDS. THESE FACTORS DIRECTLY CONTRIBUTE TO THE MINIMAL NUMBER OF NEW AND QUALITY HOUSING UNITS PRODUCED. IN TURN , LIMITED SALES DATA IN THESE AREAS OFTEN INHIBIT THE USE OF THE STANDARD COMPARABLE SALES APPROACH AND NECESSITATE THE COST BASED APPROACH IN OBTAINING APPRAISALS ON TRUST LANDS.

THIS COST APPROACH ESTIMATE WAS DEVELOPED WITH NO LAND VALUE , THEN COMPARED TO THE LOCAL FEE SIMPLE LAND MARKET FOR SIMILAR CONSTRUCTION COSTS. THIS HYBRID MODEL PROVIDES AN ESTIMATE FOR THE MARKET COSTS WHERE THERE IS LIMITED DATA AND HELPS GIVE PROXY FOR THE VALIDITY OF THE COST-BASED METHOD.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

CONTINGENT AND LIMITING CONDITIONS: The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc. ) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc. ) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated ) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

File No. hwy 212 La plant

APPRAISERS CERTIFICATION: The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to , or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

SUPERVISORY APPRAISER'S CERTIFICATION: If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED: HIGHWAY 212, LA PLANT, SD 57625

| APPRAISER: | SUPERVISORY APPRAISER (only if required) |
| --- | --- |
| Signature: [signature] | Signature: [signature] |
| Name: CHEV HACKETT | Name: THOMAS P. SMITH |
| Date Signed: 08/26/2005 | Date Signed: 08/26/2005 |
| State Certification #: | State Certification #: |
| or State License #: 931SR-2005 | or State License #: 852SL-2005 |
| State: SD | State: SD |
| Expiration Date of Certification or License: 9/30/2005 | Expiration Date of Certification or License: |
| | ☐ Did ☒ Did Not Inspect Property |

# DIMENSION LIST ADDENDUM

Borrower: GARREAU
File No.: hwy 212 La plant
Property Address: HIGHWAY 212
Case No.:
City: LA PLANT
State: SD
Zip: 57625
Lender: CHEYENNE RIVER HOUSING AUTHORITY

GROSS BUILDING AREA (GBA) 1,062
GROSS LIVING AREA (GLA) 1,062

| Area(s) | Area | % of GBA |
|---|---|---|
| Living | 1,062 | 100.00 |
| Level 1 | 1,062 | 100.00 |
| Level 2 | 0 | 0.00 |
| Level 3 | 0 | 0.00 |
| Other | 72 | 6.78 |
| Basement | 0 | 0.00 |
| Garage | 0 | 0.00 |

| Area Measurements | | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Measurements | | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
| 42.00 | x 15.00 | x 1.00 | = 630.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 36.00 | x 12.00 | x 1.00 | = 432.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

This form was produced on the ACI Development RapidForms system (800) 234-8727

SUBJECT PROPERTY PHOTO ADDENDUM

| | | |
|---|---|---|
| Borrower: GARREAU | | |
| Property Address: HIGHWAY 212 | File No.: hwy 212 La plant | |
| City: LA PLANT | Case No.: | |
| Lender: CHEYENNE RIVER HOUSING AUTHORITY | State: SD | Zip: 57625 |



FRONT VIEW OF
SUBJECT PROPERTY

Appraised Date: June 10, 2005
Appraised Value: $ 44,000



REAR VIEW OF
SUBJECT PROPERTY



STREET SCENE

## COMPARABLE PROPERTY PHOTO ADDENDUM

| | | |
|---|---|---|
| Borrower: GARREAU | | File No.: hwy 212 La plant |
| Property Address: HIGHWAY 212 | | Case No.: |
| City: LA PLANT | State: SD | Zip: 57625 |
| Lender: CHEYENNE RIVER HOUSING AUTHORITY | | |

COMPARABLE SALE #1

Sale Date:
Sale Price: $



COMPARABLE SALE #2

Sale Date:
Sale Price: $



COMPARABLE SALE #3

Sale Date:
Sale Price: $

AMERICAN VALUES

# MULTI-PURPOSE SUPPLEMENTAL ADDENDUM

FOR FEDERALLY RELATED TRANSACTIONS

hwy 212 La plant

Borrower/Client GARREAU
Property Address HIGHWAY 212
City LA PLANT County DEWEY State SD Zip Code 57625
Lender CHEYENNE RIVER HOUSING AUTHORITY

This Multi-Purpose Supplemental Addendum for Federally Related Transactions was designed to provide the appraiser with a convenient way to comply with the current appraisal standards and requirements of the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of Currency (OCC), The Office of Thrift Supervision (OTS), the Resolution Trust Corporation (RTC) and the Federal Reserve.

This Multi-Purpose Supplemental Addendum is for use with any appraisal. Only those statements which have been checked by the appraiser apply to the property being appraised.

## [X] PURPOSE & FUNCTION OF APPRAISAL

The purpose of the appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender in evaluating the subject property for lending purposes. This is a federally related transaction.

## [X] EXTENT OF APPRAISAL PROCESS

[X] The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales within the subject market area. The original source of the comparables is shown in the Data Source section of the market grid along with the source of confirmation, if available. The original source is presented first. The sources and data are considered reliable. When conflicting information was provided, the source deemed most reliable has been used. Data believed to be unreliable was not included in the report nor used as a basis for the value conclusion.

[X] The Reproduction Cost is based on MARSHALL AND SWIFT COST HANDBOOK/ LOCAL BUILDERS supplemented by the appraiser's knowledge of the local market.

[X] Physical depreciation is based on the estimated effective age of the subject property. Functional and/or external depreciation, if present, is specifically addressed in the appraisal report or other addenda. In estimating the site value, the appraiser has relied on personal knowledge of the local market. This knowledge is based on prior and/or current analysis of site sales and/or abstraction of site values from sales of improved properties.

[X] The subject property is located in an area of primarily owner-occupied single family residences and the Income Approach is not considered to be meaningful. For this reason, the Income Approach was not used.

[ ] The Estimated Market Rent and Gross Rent Multiplier utilized in the Income Approach are based on the appraiser's knowledge of the subject market area. The rental knowledge is based on prior and/or current rental rate surveys of residential properties. The Gross Rent Multiplier is based on prior and/or current analysis of prices and market rates for residential properties.

[ ] For income producing properties, actual rents, vacancies and expenses have been reported and analyzed. They have been used to project future rents, vacancies and expenses.

## SUBJECT PROPERTY OFFERING INFORMATION

According to DEWEY COUNTY DIRECTOR OF EQUALIZATION / OWNERS the subject property;
[X] has not been offered for sale in the past: [ ] 30 days [ ] 1 year [X] 3 years
[ ] is currently offered for sale for $
[ ] was offered for sale within the past: [ ] 30 days [ ] 1 year [ ] 3 years for $
[ ] Offering information was considered in the final reconciliation of value.
[ ] Offering information was not considered in the final reconciliation of value.
[ ] Offering information was not available. The reasons for unavailability and the steps taken by the appraiser are explained later in this addendum.

## SALES HISTORY OF SUBJECT PROPERTY

According to DEWEY COUNTY DIRECTOR OF EQUALIZATION the subject property;
[ ] has not transferred in the past twelve months. [X] has not transferred in the past thirty-six months.
[ ] has transferred in the past twelve months. [ ] has transferred in the past thirty-six months.
[ ] All prior sales which have occurred in the past twelve months are listed below and reconciled to the appraised value, either in the body of the report or in the addenda.

| Date | Sales Price | Document # | Seller | Buyer |
|---|---|---|---|---|
| | | | NO SALES WITHIN 3 YEARS | |
| | | | | |
| | | | | |

## [X] FEMA FLOOD HAZARD DATA

[ ] Subject property is not located in a FEMA Special Flood Hazard Area.
[X] Subject property is located in a FEMA Special Flood Hazard Area.

| Zone | FEMA Map/Panel# | Map Date | Name of Community |
|---|---|---|---|
| | | 2/16/96 | |

[ ] The community does not participate in the National Flood Insurance Program.
[X] The community does participate in the National Flood Insurance Program.
[X] It is covered by a regular program.
[ ] It is covered by an emergency program.

AMERICAN VALUES hwy 212 La plant

## ☒ CURRENT SALES CONTRACT

☒ The subject property is currently not under contract.
☐ The contract and/or escrow instructions were not available for review. The unavailability of the contract is explained later in the addenda section.
☐ The contract and/or escrow instructions were reviewed. The following summarizes the contract:

| Contract Date | Amendment Date | Contract Price | Seller |
|---|---|---|---|
| | | | |

☐ The contract indicated that personal property was not included in the sale.
☐ The contract indicated that personal property was included. It consisted of ______ Estimated contributory value is $ ______
☐ Personal property was not included in the final value estimate.
☐ Personal property was included in the final value estimate.
☐ The contract indicated no financing concessions or other incentives.
☐ The contract indicated the following concessions or incentives: ______

☐ If concessions or incentives exist, the comparables were checked for similar concessions and appropriate adjustments were made, if applicable, so that the final value conclusion is in compliance with the Market Value defined herein.

## ☒ MARKET OVERVIEW

1-6 months is considered a reasonable marketing period for the subject property based on BLACK HILLS MLS DATA AND CURRENT MARKET CONDITIONS.

## ☒ ADDITIONAL CERTIFICATION

The Appraiser certifies and agrees that:

(1) Their analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), except that the Departure Provision of the USPAP does not apply.
(2) Their compensation is not contingent upon the reporting of predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.
(3) This appraisal assignment was not based on the requested minimum valuation, a specific valuation, or the approval of a loan.

## ☒ ADDITIONAL (ENVIRONMENTAL) LIMITING CONDITIONS

The value estimated is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions unless otherwise stated in this report. The appraiser is not an expert in the identification of hazardous substances or detrimental environmental conditions. The appraiser's routine inspection of and inquiries about the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively unless otherwise stated in this report. It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of hazardous substances or detrimental environmental conditions on or around the property that would negatively affect its value.

## ADDITIONAL COMMENTS

## ☒ APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION

Appraiser's Signature [signature]
Appraiser's Name (print) CHEV HACKETT Phone # (605 )341-0366
State SD ☒ License ☐ Certification # 931SR-2005

Effective Date 6/10/2005
Date Prepared 08/26/2005
Tax ID # 75-3110648

## CO-SIGNING APPRAISER'S CERTIFICATION

☐ The co-signing appraiser has personally inspected the subject property, both inside and out, and has made an exterior inspection of all comparable sales listed in the report. The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of the report including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser
☐ The co-signing appraiser has not personally inspected the interior of the subject property and:
☐ has not inspected the exterior of the subject property and all comparable sales listed in the report.
☐ has inspected the exterior of the subject property and all comparable sales listed in the report.
☐ The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of the report, including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser with the exception of the certification regarding physical inspections. The above describes a level of inspection performed by co-signing appraiser.
☐ The co-signing appraiser's level of inspection, involvement in the appraisal process and certification are covered elsewhere in the addenda section of this appraisal.

## CO-SIGNING APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION

Co-Signing Appraiser's Signature
Appraiser's Name (print) THOMAS P. SMITH Phone # (605 )341-0366
State SD ☒ License ☐ Certification # 852SL-2005

Effective Date 6/10/2005
Date Prepared
Tax ID # 75-3110648

AMERICAN VALUES

# USPAP COMPLIANCE ADDENDUM

File No. hwy 212 La plant

Borrower GARREAU Order #
Property Address HIGHWAY 212
City LA PLANT County DEWEY State SD Zip Code 57625
Lender/Client CHEYENNE RIVER HOUSING AUTHORITY Client Reference #

*Only those items checked [X] below apply to this report.*

## PURPOSE, FUNCTION AND INTENDED USE OF THE APPRAISAL

[X] The purpose of the appraisal is to provide an opinion of market value of the subject property as defined in this report, on behalf of the appraisal company facilitating the assignment for the referenced client as the intended user of the report. The *only* function of the appraisal is to assist the client mentioned in this report in evaluating the subject property for lending purposes. The use of this appraisal by anyone other than the stated intended user, or for any other use than the stated intended use, is prohibited.

[ ] The purpose of the appraisal is to provide an opinion of market value of the subject property, as defined in this report, on behalf of the appraisal company facilitating the assignment for the referenced client as the intended user of this report. The *only* function of the appraisal is to assist the client mentioned in this report in evaluating the subject property Real Estate Owned (REO) purposes. The use of this appraisal by anyone other than the stated intended user, or for any other use than the stated intended use, is prohibited.

[ ] The purpose of this appraisal is to ____________, on behalf of the appraisal company facilitating the assignment for the referenced client as the intended user of this report. The only function of the appraisal is to assist the client mentioned in this report in evaluating the subject property for ____________. The use of this appraisal by anyone other than the stated intended user, or for any other use than the stated intended use is prohibited.

## TYPE OF APPRAISAL AND APPRAISAL REPORT

[X] This is a COMPLETE Appraisal written in a SUMMARY Report format and the USPAP Departure Rule has *not* been invoked.
[ ] This is a Limited Appraisal written in a ____________ Report format and the USPAP Departure Rule *has* been invoked as disclosed in the body or addenda of the report. The client has agreed that a Limited Appraisal is sufficient for its purposes.

## SCOPE (EXTENT) OF REPORT

[X] The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales, listings, and/or rentals within the subject market area. The original source of the comparables is shown in the Data Source section of the market grid along with the source of confirmation, if available. The original source is presented first. The sources and data are considered reliable. When conflicting information was provided, the source deemed most reliable has been used. Data believed to be unreliable was not included in the report nor used as a basis for the value conclusion. The extent of analysis applied to this assignment may be further imparted within the report, the Appraiser's Certification below and/or any other Statement of Limiting Conditions and Appraiser's Certification such as may be utilized within the Freddie Mac form 439 or Fannie Mae form 1004b (dated 6/93), when applicable.

## MARKETING TIME AND EXPOSURE TIME FOR THE SUBJECT PROPERTY

[X] A reasonable marketing time for the subject property is 30-240 day(s) utilizing market conditions pertinent to the appraisal assignment.
[X] A reasonable exposure time for the subject property is 30-240 day(s).

## APPRAISER'S CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved, unless otherwise stated within the report.
- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- I have [X] or have not [ ] made a personal inspection of the property that is the subject of this report. (If more than one person signs this report, this certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraised property.)
- No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant professional assistance must be stated.)

*NOTE: In the case of any conflict with a client provided certification (i.e., Fannie Mae or Freddie Mac), this revised certification shall take precedence.*

- Supervisory Appraiser's Certification: If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 2-7 and 9 on the second page of Freddie Mac Form 439 6-93/Fannie Mae Form 1004B 6-93, or the third page of Form 2055, and am taking full responsibility for the appraisal report.

## APPRAISER'S AND SUPERVISORY APPRAISER'S SIGNATURE

**APPRAISER:**

Signature: [signature]
Name: CHEV HACKETT
Date the Report was Signed: 08/26/2005
State Certification #:
or State License #: 931SR-2005
State: SD
Expiration Date of Certification or License: 9/30/2005

**SUPERVISORY APPRAISER (only if required):**

Signature: [signature]
Name: THOMAS P. SMITH
Date the Report was Signed: 08/26/2005
State Certification #:
or State License #: 852SL-2005
State: SD
Expiration Date of Certification or License:

[ ] Did inspect subject property [ ] Interior & Exterior [ ] Exterior only
[ ] Inspected Comparables [ ] Interior & Exterior [ ] Exterior only

**AMERICAN VALUES**

| | |
|---|---|
| Borrower: GARREAU | File No.: hwy 212 La plant |
| Property Address: HIGHWAY 212 | Case No.: |
| City: LA PLANT State: SD | Zip: 57625 |
| Lender: CHEYENNE RIVER HOUSING AUTHORITY | |



FLOORPLAN

Borrower: GARREAU
Property Address: HIGHWAY 212
City: LA PLANT
Lender: CHEYENNE RIVER HOUSING AUTHORITY

File No.: hwy 212 La plant
Case No.:
State: SD
Zip: 57626

First Floor




Sketch by Apex IV Windows™

AREA CALCULATIONS SUMMARY

| Code | Description | Size | Totals |
|---|---|---|---|
| GLA1 | First Floor | 1062.00 | 1062.00 |
| P/P | Porch | 72.00 | 72.00 |
| | TOTAL LIVABLE (rounded) | | 1062 |

LIVING AREA BREAKDOWN

| Breakdown | Subtotals |
|---|---|
| First Floor | |
| 15.0 x 42.0 | 630.00 |
| 12.0 x 36.0 | 432.00 |
| 2 Areas Total (rounded) | 1062 |

FLOORPLAN

| | | | |
|---|---|---|---|
| Borrower: GARREAU | | File No.: hwy 212 La plant | |
| Property Address: HIGHWAY 212 | | Case No.: | |
| City: LA PLANT | State: SD | Zip: 57625 | |
| Lender: CHEYENNE RIVER HOUSING AUTHORITY | | | |

FLOORPLAN

Borrower: GARREAU
File No.: hwy 212 La plant
Property Address: HIGHWAY 212
Case No.:
City: LA PLANT
State: SD
Zip: 57625
Lender: CHEYENNE RIVER HOUSING AUTHORITY

FLOORPLAN

Borrower: GARREAU
Property Address: HIGHWAY 212 File No.: hwy 212 La plant
Case No.:
City: LA PLANT State: SD Zip: 57625
Lender: CHEYENNE RIVER HOUSING AUTHORITY

FLOORPLAN

Borrower: GARREAU
Property Address: HIGHWAY 212 File No.: hwy 212 La plant
Case No.:
City: LA PLANT State: SD Zip: 57625
Lender: CHEYENNE RIVER HOUSING AUTHORITY

FLOORPLAN

Borrower: GARREAU
Property Address: HIGHWAY 212 File No.: hwy 212 La plant
City: LA PLANT Case No.:
Lender: CHEYENNE RIVER HOUSING AUTHORITY State: SD Zip: 57625

LOCATION MAP

| | |
|---|---|
| Borrower: GARREAU | File No.: hwy 212 La plant |
| Property Address: HIGHWAY 212 | Case No.: |
| City: LA PLANT State: SD | Zip: 57625 |
| Lender: CHEYENNE RIVER HOUSING AUTHORITY | |



Borrower: GARREAU
Property Address: HIGHWAY 212 File No.: hwy 212 La plant
City: LA PLANT Case No.:
Lender: CHEYENNE RIVER HOUSING AUTHORITY State: SD Zip: 57625

# Standard Report

| | |
|---|---|
| Estimate ID | hwy212laplant |
| Property Owner | Margaret S. Eagle Staff |
| Address | Highway 212 |
| City | La Plant |
| State/Province | SD |
| ZIP/Postal Code | 57625 |
| Surveyed By | Chet Hacker |
| Survey Date | |
| Appraised For | CA |

**Single-family Residence**

| | | |
|---|---|---|
| Effective Age | 14 | Floor Area 1082 Square Feet |
| Cost as of | 06/2005 | Quality 2.5 Fair / Average |
| Style | One Story | Condition 1.5 Worn Out / Badly Worn |
| Exterior Wall | Frame, Hardboard Sheets 100% | |
| Plumbing Fixtures | 6 | |

| Description | Units | Unit Cost | Total |
|---|---|---|---|
| Base Cost | | | |
| Plumbing Fixtures | 1,062 | $44.78 | $47,528 |
| Comp. Shingle or Built-up Rock | 6 | $835.48 | $4,850 |
| Raised Subfloor | 1,062 | $1.58 | $1,678 |
| Floor Cover Allowance | 1,062 | $5.72 | $6,075 |
| Electric Baseboard | 1,062 | $2.34 | $2,485 |
| Plumbing Rough-ins | 1,062 | $2.69 | $2,857 |
| Basic Structure Total Cost | 1 | $543.16 | $543 |
| Slab Porch with Roof | 1,062 | $61.97 | $65,973 |
| Subtotal Extras | 98 | $13.66 | $1,311 |
| Replacement Cost New | | | $1,311 |
| Physical + Functional Depreciation: 14.5% | 1,062 | $63.21 | $67,128 |
| External Depreciation (20.0% ADM) | | | $9,732 |
| Total Depreciated Cost | | | $13,429 |
| Total | | | $42,967 |
| Total, Rounded to Nearest $100 | | | $43,967 |
| | | | $44,000 |

Cost data by Marshall & Swift, L.P.

MARSHALL & SWIFT

Borrower: GARREAU
Property Address: HIGHWAY 212 File No.: hwy 212 La plant
City: LA PLANT Case No.:
Lender: CHEYENNE RIVER HOUSING AUTHORITY State: SD Zip: 57625



**Cheyenne River Housing Authority**
P. O. Box 480
Eagle Butte, SD 57625

605-964-4265 Phone
605-964-1070 Fax

October 19, 2004

Yvonne Garreau
PO Box 949
Eagle Butte, SD 57625

Dear Yvonne:

Congratulations! Our records indicate that your Mutual Help house is ready to convey to you. Your equity and reserve accounts are equal to the amortized balance purchase price of your home. As a result, the Cheyenne River Housing Authority (CRHA) must convey title of unit 1035-02 to you.

You will have a few responsibilities along with your new homeownership. You will now have sole responsibility for maintenance of your home and insurance payments. The CRHA will pay the insurance on your home for three months after conveyance of title to you, thus giving you ample time to find your own insurance.

The above-mentioned coverage includes the structure of the house only, and not your personal property within the house. You should consider what type of coverage you want to continue with, i.e. whether to include personal property within the policy.

I would like to meet with you to make arrangements for conveyance of title to your home. Please call me at 964-4265 when you receive this letter so we can set up a time to meet.

Sincerely,

Colette Ganje

Colette Ganje
Legal Clerk

cc: file

PLAINTIFF'S EXHIBIT
D

Certified: 7003 2260 0006 8805 0632

Certified: 7003 2260 0006 8805 0632

**United States Department of the Interior**

BUREAU OF INDIAN AFFAIRS
CHEYENNE RIVER AGENCY
POST OFFICE BOX 325
EAGLE BUTTE, SOUTH DAKOTA 57625

IN REPLY REFER TO:

Executive Direction

December 10, 2004

COPY

Yvonne Garreau
Box 949
Eagle Butte, SD 57625

Dear Mrs. Garreau,

The majority interest holders in tract X-1252 are requesting that you move your house from their property. Upon checking with the Cheyenne River Housing Authority we realize that your house is currently in the process of being conveyed to yourself.

At the current time we have found that you have taken possession of said land without a proper lease. The landowners have indicated that they are not interested in negotiating a lease. This unauthorized use of their land constitutes a trespass.

You are hereby notified that within thirty (30) days of receipt of this notice that you are to vacate said property and remove all your possessions. This includes, but is not limited to your house, abandoned vehicles, and other items that you legally possess.

In the event that it is necessary for us to take possession and dispose of the property, you will be liable for the associated costs. You have the right to appeal this decision and for your convenience we are enclosing a copy of your appeal rights. Your prompt attention to this matter is appreciated. Thank you for your time and consideration of this letter.

Sincerely

Russell McClure

Agency Superintendent

Cc: file
R. Kidder, CRHA

Rec'd 12/14/04

PLAINTIFF'S EXHIBIT
E

1

United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
CHEYENNE RIVER AGENCY
BRANCH OF REAL PROPERTY MANAGEMENT
POST OFFICE BOX 325
EAGLE BUTTE, SOUTH DAKOTA 57625

IN REPLY REFER TO:
Estate Management
(605) 964-6200

RECEIVED
MAR 1 8 2005
Rebecca

March 14, 2005

Cheyenne River Housing Authority
Box 480
Eagle Butte, SD 57625

Attn: Rebecca Kidder

Dear Ms. Kidder,

This letter is in response to your letter of March 8, 2005 inquiring as to the status of the lease of lands belonging to the Veo Family on the Cheyenne River Indian Reservation. The lease in question is lease number 72-192, entered into on September 21, 1977 and approved by the BIA on October 27, 1977. The lease expired on October 27, 2002 and would have automatically renewed for and additional 25-year term on the same date.

In correspondence to you on December 15, 2004 we stated, *"In answer to your question regarding the assignment of the lease from CRHA to Yvonne Garreau, it is clear that under Provision Five, the lease shall only be assigned with prior written consent of the Lessor or Secretary of the Interior "and, during the period HUD has a financial interest in the project"*. At that time we were informed that the CRHA was giving Mrs. Garreau a deed of conveyance, and we were not aware that CRHA still had a financial interest in the house.

As per ¶ three of your letter, it is clear that CRHA still has a financial interest in the house and thereby is still the lessee of record. The lease will have to be honored as such. But, in the event that CRHA waives, cancels, settles, or writes-off its financial interest, the CRHA's interest in the lease would no longer apply and Mrs. Garreau would have to be assigned the lease. And as you have indicated you will file a Lease Cancellation notice with us at that time.

At that time we will consult with the owners of this land regarding assignment of the lease to Mrs. Garreau. At the present time the lease has automatically renewed, the CRHA currently the lessee. Please call Mr. Gregg J. Bourland, Realty Officer at 605-964-6200 for any further information. Thank you for your time and consideration of this letter.

Sincerely,

Russell J. McClure

Agency Superintendent

Cc: Realty file

gjb

PLAINTIFF'S EXHIBIT
F