IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YVONNE GARREAUX,<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant | ) | No. 06-502<br>(Chief Judge Damich) |

PLAINTIFF'S RESPONSE AND BRIEF TO DEFENDANTS MOTION TO DISMISS

Plaintiff files this response and brief to defendant's motion to dismiss pursuant to Rule 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims. The plaintiff respectfully requests that the Court denies the defendant's motion to dismiss. The Plaintiff has plead that the Court has proper jurisdiction to entertain the current suit based upon Article I of the 1868 Fort Laramie Treaty between the United States government and the Great Sioux Nation under the Tucker Act 28 U.S.C. § 1491.

PLAINTIFF'S BRIEF

ISSUES

1. Whether this Court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491, to entertain the plaintiff's complaint because the plaintiff is an enrolled member of the Cheyenne River Sioux Tribe and is thus entitled to the relief given under Article I of the 1868 Fort Laramie Treaty "bad men" provision.

2. Whether this Court has subject matter jurisdiction under Article I of the 1868 Fort Laramie Treaty for actions which are based upon contract breach and which also "sound in tort".

3. Whether the United States government is responsible to reimburse the plaintiff under Article I of the 1868 Treaty for damages and breach of contract done by the Cheyenne River Housing Authority under the Mutual Help Home program which she participated in under her MHOA contract.

ARGUMENT

I. The Court of Federal Claims Has Subject Matter Jurisdiction To Entertain The Plaintiff's Claims Based Upon Article I Of The 1868 Fort Laramie Treaty And the Tucker Act 28 U.S.C. § 1491.

The Tucker Act gives the Court of Federal Claims Jurisdiction to entertain actions, "founded either upon the Constitution, or any Act of Congress or any regulation of any executive department, or upon any express or implied contract with the United States…" 28 U.S.C. § 1491(a)(1). Subject matter jurisdiction was established in this Court in the complaint filed by the plaintiff by pleading that the action is based Article I of the 1868 Treaty thus giving jurisdiction to the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. Compl. p. 1 at ¶ 1-3. The plaintiff also alleges that the cause of action is based upon Article I of the Fort Laramie Treaty under the "Cause of Action" section of the Complaint. Compl. p. 8. The defendant's motion to dismiss should be therefore denied since the plaintiff has met her burden of establishing jurisdiction for this Court under the Tucker Act, 28 U.S.C. § 1491[1]

Article I of the 1868 Fort Laramie Treaty provides a basis for invoking Court of Federal Claims jurisdiction since Article I provides a private right of action, waives the sovereign immunity of the United States and mandates the payment of money damages. As a member of the Cheyenne River Sioux Tribe, the plaintiff Yvonne Garreaux is a

[1] The 1868 Fort Laramie Treaty with the Great Sioux Nation was ratified by the United States Congress on Feb. 16, 1869 and is thus an act of Congress thus giving jurisdiction to this Court under the Tucker Act 28 U.S.C. § 1491 "…any act of Congress…".

beneficiary of the Treaty with the Great Sioux Nation of April 29, 1868. 15 Stat. 635, ratified Feb. 16, 1869, proclaimed Feb. 29, 1868. Article I of the Treaty, states:

> *If bad men among the whites, or among other people subject to the authority of the United States*, shall commit *any wrong* upon the *person or property of the Indians*, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, *and also reimburse the injured person for the loss sustained*. [Emphasis added].

The defendant argues in their brief that Article I of the Treaty does not give this Court jurisdiction to entertain the plaintiff's complaint. Defs. Brief p. 10. The defendant attempts to make short work of dismissing the allegation that jurisdiction is based upon the above quoted treaty provision by simply arguing that the plain language simply does not provide the basis for jurisdiction. Id. In addition, the defendant argues that only tribes as governmental bodies can assert rights under treaties according to 28 U.S.C. § 1505. Defs Brief p. 10 n.5.[2]

The defendant misses that the clear language of the treaty *does* give a private right of action to individual Indians under Article I against the United States. According to cases decided and discussed in this Court and in this Court's predecessor "bad men" provisions in Indian treaties constitute a waiver of immunity, provide a private right of action, and mandate the payment of money damages. See Tsosie v. United States, 11 Cl. Ct. 62 ( Ct. Cl. 1986); Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987); Begay v. United States, 219 Ct. Cl. 599 (Ct. Cl.1979) (*Begay I*); Begay v. United States, 224 Ct Cl.

[2] The defendant also fails to make any argument regarding whether or not the provisions of the treaty are met and if any administrative determination is required before the action is filed in this Court. The defendant only discuss the administrative aspect of the Article I claim once and that is to say that it is a derivative claim against the United States. Defs. Brief p. 4 n.1.

712 (Ct. Cl. 1980) (*Begay II*); Hebah v. United State, 192 Ct. Cl. 785 (Ct. Cl. 1970) (*Hebah I*) Hebah v. United States, 197 Ct. Cl. 729 (Ct. Cl.1972) (*Hebah II*); Elk v. United States, 70 Fed. Cl. 405 (Ct. Cl. 2006). Although Tsosie, Begay and Hebah all dealt with treaties with other tribes than the Sioux the treaty language in each case was substantial similar, if not the exact same language, that is found in Article I of the 1868 Treaty with the Great Sioux Nation.

In Tsosie, the Court found that Article I of the 1868 Treaty with the Navajo gave the Court of Claims jurisdiction to entertain a suit brought by an individual Navajo against the United States Government. Tsosie, 11 Cl. Ct. 62, 75-6 (Ct. Cl. 1986). The Tsosie action was based upon a similar "bad men" provision that is found in Article I of the 1868 Treaty with the Great Sioux Nation. Navajo Treaty of June 1, 1868, Art. I, 15 Stat. 667-68.[3] The Court in Tsosie held that based upon the principle of *stare decisis* the government's motion to dismiss must be denied since previous Court of Claims decisions held that "bad men" provisions in Indian treaties give this Court jurisdiction to entertain claims brought by individual Indians. Id. On appeal, the Appeals Court for the Federal Circuit up held the decision in Tsosie that the treaty provision was not obsolete and that therefore the Court had jurisdiction to hear the claim under the Tucker Act, 28 U.S.C. § 1491 because of the "bad men" language in Article I of the 1868 Treaty with the Navajo. Tsosie v. United States, 825 F.2d 393, 402-03 (Fed. Cir. 1987). It should also be noted

[3] The pertinent part of Article I of the Navajo Treaty states that, "If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained." Navajo Treaty of June 1, 1868. Art. I. 15 Stat. 667.

that the plaintiff's claim in Tsosie was also a tort claim that arose from her receiving a medical examination from a laboratory technician that posed as a doctor and performed the examination on her. Tsosie, 11 Cl. Ct.62, 64-5 (1986).

The Hebah case was yet another case that involved the same "bad men" language that is founded in Article I of the 1868 Fort Laramie Treaty with the Great Sioux Nation. Hebah I, 192 Ct. Cl. 787 *Citing to* Treaty of July 3, 1868 Art. I 15 Stat 673.[4] Hebah was a case that sounded in tort and was based upon an action against the United States government for allowing a "bad man" to injury the plaintiff. Id. at 788 n.2. The tort was one of wrongful death where the plaintiff alleged that an officer of the law shot and killed the plaintiff's husband wrongfully. Id.

In Hebah, the Court also held that the wording of the treaty with the Eastern Band of Shoshonees and Bannock Tribe of Indians gave the Court jurisdiction under 28 U.S.C. § 1491 to entertain individual Indian claims for damages without the limitation of 28 U.S.C. § 1505. Hebah v. United States, 192 Ct. Cl. 787, 790-92 (Ct. Cl 1970). The Court held that jurisdiction is proper within the Court of Claims under the Tucker Act when an individual Indian sues the United States for damages under Article I of the treaty. Id. The Court stated that although the majority of Indian treaties create tribal, not individual rights, exceptions have been found in other cases besides under Article I. Id. at 789-90. *Citing to* Sioux Tribe of Indians v. United States, 89 Ct. Cl. 31 (1939).

In Hebah, the Court also held that although treaties are made with tribes, the accepted theory of third-party contractual beneficiaries gave the plaintiff the legal right to

---

[4] The pertinent part of the Treaty with the Eastern Band of Shoshonees and Bannack Tribe of Indians involved in the Hebah case is exactly the same as the language in the Treaty with the Great Sioux Nation and the language with the Navajos quoted in n.3 of this brief.

vindicate and enforce the Federal government's promise under Article I. Hebah, 192 Ct. Cl. at 791. The Court went further to state that,

> "…the injured Indian is an "intended beneficiary" of Article I because recognition of his rights is appropriate to effectuate the intention of the treaty-parties, and the Federal Government's promise of redress and reimbursement manifest an intention to give those benefits to the 'injured person' himself, directly." Id.

The Court held that this liberal interpretation of Article I is, "…supported by the established principle that Indian treaties should be read, where possible, generously in favor of the Indians." Id. In addition, the Court held that 28 U.S.C. § 1505 does not limit the jurisdiction of the Court when individual claims are brought under Article I "bad men" provisions. Hebah, 192 Ct. Cl. 787, 791-92

In Begay series of cases, the Court of Claims once again dealt with a claim that was based upon "bad men" language found in the treaty with the Navajo nation. Begay v. United States., 219 Ct. Cl. 599, 600-01. (1979) ( *Begay I*). In Begay, the action was based upon tort and jurisdiction was given to the Court of Claims based upon the "bad men" provision of the Navajo Treaty which is substantially similar to the treaty with the Great Sioux Nation as noted in the discussion of the Tsosie case. Id. In Begay, the Court ordered that an administrative hearing be done by the Department of Interior pursuant Article I of the Treaty. Begay, 219 Ct. Cl. 599, 602-03. Ultimately, the case was decided based upon the administrative decision of the Department of Interior. Begay v. United States, 224 Ct. Cl. 712, 716 (1980) (*Begay II*).

This Court has also recently heard another case that came to it under Article I of the 1868 Treaty with the Great Sioux Nation. Elk v. United States, 70 Fed. Cl. 405 (Ct. Cl. 2006). In Elk, this Court decided that the administrative provision of Article I of the

1868 treaty had little effect as the treaty did not specifically require an administrative decision to be made before a suit could be filed in this Court. Elk, 70 Fed. Cl. at 411-12. Furthermore, as the Court noted, no administrative rules had been promulgated to determine Article I claims. Id. In Elk, the United States Government did not argue that the treaty provision failed to give this Court jurisdiction, rather the defendants argued only that the plaintiff failed to exhaust their administrative remedies under Article I of the Treaty. Elk, 70 Fed. Cl. at 406-07.

Additionally, the defendant argues in their motion to dismiss that only Indian tribes may sue in this Court based upon 28 U.S.C. § 1505. The defendant cites to Fields v. United States, 423 F.2d 380 (Ct. Cl. 1970) as the case which held this to proposition to be so. The plaintiff agrees that 28 U.S.C. § 1505 does not give the plaintiff in this action standing to sue the United States. However, the plaintiff, unlike the plaintiff in Fields, has not asserted that 28 U.S.C. § 1505 gives this Court jurisdiction in her complaint. Rather the plaintiff has specifically plead and argued that jurisdiction is given to this Court by Article I of the 1868 Fort Laramie Treaty. Compl. p.1. In Fields, the plaintiff argued that as an individual he could assert an individual right to sue under 28 U.S.C. § 1505. Fields, 423 F.2d 380, 383-84 The plaintiff in Fields made no mention and did not claim that jurisdiction was proper under a specific article of a treaty. Id. Thus, the Fields case is distinguishable from this current case as jurisdiction in the current case is dependant upon an identifiable individual right given to individual Indians. As well, as the Court found in Hebah 28 U.S.C. § 1505 does not nullify the express language of a treaty or limit the ability of the Court to have jurisdiction of individual Indian claims under the Tucker Act, 28 U.S.C. § 1491. Hebah v. United States, 192 Ct. Cl. 787, 791-92 .

A. Under The Indian Canon of Construction Article I Should Be Read And Liberally Construed To Give A Private Right of Action To The Plaintiff.

It is a well known principle of Federal Indian law that treaties with Indians are to be read liberally and are to be construed liberally due to the Indians status as an unlettered people when Anglo-Americans entered into treaties with them and because of the United States special trust relationship with Indians. *See* McClanahan v. State Tax Comm'n, 411 U.S. 164, 174 (1973); Carpenter v. Shaw, 280 U.S. 363, 367 (1930); Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32. (1943). The Indian Canon of Construction holds that the language of a treaty be read broadly and, "in the sense in which the Indians understood them…" Choctaw Nation, 318 U.S. at 432 .Article I of the treaty, read under the light of the Indian Cannon of Construction, clearly shows that individual Indians have a private right of action against the United States Government for harm done to the them by "bad men" or those under the control of the United States. Also, Article I provides for a waiver of sovereign immunity of the United States by allowing the individual Indian to seek reimbursement for harm done to them. The payment of money damages is also part of Article I when Article I states that the injured party will be reimbursed. Art. I 186 Fort Laramie Treaty with the Great Sioux Nation. 15 Stat.635. Thus, Article I should provide the plaintiff with a cause of action against the United States since "bad men" injured the plaintiff in her person and property as the plaintiff has plead in her complaint.

B. All of the Required Elements Under Article I of the 1868 Treaty Have Been Met and Thus The Action Should Not be Dismissed.

Jurisdiction, as argued above, is based upon Article I and sufficient facts have set forth the requisite elements to give this Court jurisdiction pursuant to the Tucker Act 28

U.S.C. § 1491. First, the plaintiff is an enrolled Indian with the Cheyenne River Sioux Tribe and resides on the Cheyenne River Reservation, thus her rights are covered by the 1868 Fort Laramie Treaty. Compl. p. 1 ¶1-3. Therefore, her individual right to sue the United States is granted to her under Article I of the treaty because of her political status as an enrolled member of the Cheyenne River Sioux Tribe.

Second, the plaintiff has plead in her complaint that "…bad men among the whites, or among other people subject to the authority of the United States…" have committed a wrong against the plaintiff's property. Compl. p. 9 ¶12. The "bad men" in this case are agents of the Bureau of Indian Affairs ("BIA") and Housing and Urban Development ("HUD") who failed to properly administer the land lease and the Mutual Home and Occupancy Agreement ("MHOA") which has caused the plaintiff to essentially loose her home. Compl. p. 8-9. In addition, the plaintiff has plead that the Cheyenne River Housing Authority ("CRHA") has breached the contract with the plaintiff since the plaintiff bargained with the CRHA to receive a home pursuant to the MHOA agreement which she will now not be able to receive. Thus, "bad men" who are subject to the authority of the United States have acted in such a way as to harm the plaintiff.[5] Id.

Third, the treaty specifically covers "any wrong" that is committed against the person or property of the Indians. Art. I 1868 Fort Laramie Treaty. 15 Stat. 667. There should be no question or doubt that a wrong has been committed against the plaintiff. The plaintiff, an elderly American Indian woman entered into an agreement with the local

[5] The plaintiff has been harmed by both the actions of the BIA and HUD in administering and over sight of the land lease, the Mutual Help Home project and the MOHA contract. As well, the plaintiff has been harmed by the CRHA by their breach of the contract and by their tortious conduct in administering the MHOA agreement. Compl. p. 8-10.

housing authority pursuant to the rules and regulations for MHOA agreements which were administered by HUD. Compl. p. 3 ¶14-16. That through the tortuous conduct of HUD and the BIA the plaintiff cannot have the home which she has purchased. Compl. p. 8-9. Furthermore, that the MHOA agreement has been breached because the plaintiff has not received a home which she bargained for in the agreement, namely a home that is safe, sanitary and which she can actually possess and own free and clear. [6] Compl. p. 8-10. The fact that the plaintiff has not received a home which is safe and sanitary and which can be transferred to her constitutes a wrong against the plaintiff's person.

Regardless of whether the "wrongs" committed against the plaintiff sound in tort or are based upon a breach of contract the treaty covers both of the wrongs by clearly saying "any wrong". The treaty does not limit the wrong to a breach of contract, a tort, an intentional tort or place any other limitation upon the type of "wrong" that needs to committed in order to invoke Article I rights.

Finally, Article I of the treaty specifically promises the reimbursement for any damages that were done to the person or property of the individual Indian when it says, "…reimburse the injured person for the loss sustained." Art I. 1868 Fort Laramie Treaty 15 Stat. 635. The plaintiff has specifically asked for monetary relief that will reimburse her for the wrong and harm that has been done to her by the "bad men". Compl. p. 9-10. As well, the language in the treaty indicates that the reimbursement will come from the United States government. The plaintiff has plead in her complaint that jurisdiction is proper in this Court based upon Article I of the 1868 Fort Laramie Treaty with the Great

---

[6] It should be noted that although the Treaty also states that the offending bad man should be arrested this has not been held by any of the Courts to be held as a prerequisite to bringing an action. Indeed, under the language used in Article I, "any wrong" would include even those wrongs which are not criminal in nature.

Sioux Nation. Compl. p. 1. Based upon the argument stated above Article I of the Treaty gives this Court subject matter jurisdiction to entertain an individual Indian persons complaint pursuant to the Tucker Act, U.S.C. § 1491. The government's motion to dismiss should thus be denied since the plaintiff has plead a basis to invoke the jurisdiction of this Court and upon which relief can be granted.

II. <u>The Court Of Federal Claims Has Jurisdiction Over The Plaintiff's Action Regardless Of Whether Her Claim(s) Sound In Tort Or Are Based Upon The Breach Of Her MHOA Contract.</u>

The defendant argues that the plaintiff's cause of action sound in tort and that because of this the Court does not have jurisdiction under the Tucker Act, 28 U.S.C. § 1491. Defs. Brief p. 10. The defendant has missed the point that jurisdiction in this case is not based upon whether or not this is a breach of contract or a tort, but that Article I of the 1868 Fort Laramie Treaty is the gate by which this Court has jurisdiction under the Tucker Act. Compl. p. 1. Regardless of whether or not the actions of the "bad men" are tortious or are simply a matter of a breach of contract this Court, and only this Court, has proper jurisdiction to decide this matter when the action is brought under Article I since it is a treaty with the United States. Thus, although some of the actions which have caused harm to the plaintiff are tortious in nature this is not a basis to dismiss the plaintiff's complaint for lack of jurisdiction since jurisdiction is based upon Article I of the 1868 Fort Laramie Treaty. 15 Stat. 635.

III. <u>The United States Government Is Responsible For The Actions Of The Local Housing Authority And For The Breach Of The MHOA Contract.</u>

The plaintiff has plead in her civil complaint that a breach of contract has occurred. Compl. p. 8-10. In ¶5 under the Plaintiff's Complaint for "CAUSE OF ACTION" the plaintiff pleads that the contract that she entered into has been breached.

Compl. p. 8. It has been breached because, as the plaintiff sets forth in her civil complaint, she bargained with the local housing authority, Cheyenne River Housing Authority ("CRHA") and entered into the MHOA contract agreement with the belief that at the end of the contract terms she would receive her house free and clear. Compl. p. 3-5. The plaintiff entered into a contractual agreement to purchase a home and has made payments pursuant to that agreement. Compl. p. 8-9. However, now that she completed her end of the bargain the home is not going to be transferred to her. Thus, a breach of the underlying agreement and contract has been breached. Id.[7]

The defendant argues in their brief that the United States government is not liable for the breach of MHOA contract or for any of the actions of the Cheyenne River Housing Authority. Defs. Brief p. 7. The defendant argues that the Government's involvement and supervising of a contract between public agency and does not create a contract between the United States and the private party. Defs. Brief p. 7 *Citing to* New Era Construction v. United States, 890 F.2d 1152, 1555 (Fed. Cir. 1989). The defendant also argues that HUD is not liable for contracts entered into by local housing authorities even when HUD exercises some level of control over the projects of such housing authorities. Defs. Brief p. 7 *Citing to* Eubanks v. United States, 25 Cl. Ct. 131 (1992); DeRoche v. United States, 2 Cl. Ct. 809 (Ct. Cl. 1983); Housing Corporation of America v. United States, 468 F.2d 922 (Ct. Cl. 1972). In particular, the defendant argues that the holding in New Era Construction controls the determination of whether or not HUD would be liable for a contract that was entered into between an Indian Housing Authority

[7] The defendant argues that the plaintiff has failed to provide the contract (MHOA Agreement). The plaintiff's complaint, however, specifically sets out the fact that the local Housing Authority has lost the original MHOA Agreement. Defs. Brief p. 6. See the complaint at page 3 ¶ 16.

and a private contractor. Defs. Brief p. 7-8 *Citing to* New Era Construction, 890 F.2d 1152, 1155.

All of the cases used by the defendant to argue that the United States government is not liable for contracts that are entered into by local housing authorities are distinguishable from the current case. None the cases cited or argued in the defendant's brief dealt with MHOA contracts with private, individual Indian people. Indeed, in New Era Construction, the contract was a contract with a private contractor which was not based upon an MHOA or agreement or its federal regulations. New Era Construction, 890 F.2d 1152, 1155. None of the cases cited by the defendant also had the same level of involvement with the development of the contract as HUD had with the home at issue in this case and with the plaintiff's MHOA agreement.

In this case, HUD was also a part of the initial lease agreement and approved the initial lease agreement upon which the plaintiff's MHOA home was built. As well, none of the cases cited by the defendant were brought under the "bad men" language as it is found in the treaty at issue in this case. Finally, the plaintiff in her case is not arguing that the United States government is liable for the breach of contract because they are a party to contract but that they are liable for breach of contract because they exercised substantial control over the party who has breached the contract, namely CRHA. Since they exercised such control over the Mutual Help Home project they thus become "bad men" under Article I of the treaty who are under the control of the United States and thus the United States is liable to reimburse the injured person for the wrong committed against them.

A recent series of Federal Court cases have dealt with the relationship between Indian Housing Authorities and HUD when it comes to administering Mutual Help Programs. Dewakuku v. Cuomo, 107 F. Supp. 2d 1117 (D. Ariz. 2000) (*Dewakuku I*); Dwakuku v. Martinez, 271 F.3d 1031 (Fed. Cir. App. 2001); Dewakuku v. Martinez, 226 F. Supp. 2d 1199 (D. Ariz. 2002) (*Dewakuku II*). In Dewakuku I, the plaintiff sued the United States based on the Indian Housing Act and the Administrative Procedures Act for providing her a home that was substandard and which was not safe and sanitary as the Indian Housing Act dictated homes be made pursuant to its legislation. Dewakuku v. Cuomo, 107 F. Supp. 2d 1117 (D. Ariz. 2000). In the Dewakuku series of cases the home at issue was built in 1991 pursuant to a MHOA contract between the plaintiff and the Hopi Tribal Housing Authority. Id. at 1117-18. The final home that was given to the plaintiff was poorly constructed and it did not meet the standards of safe and sanitary home as the Indian Housing Act required of all Mutual Help Homes. Id.

As the Court stated in Dewakuku II, "HUD's supervisory powers over tribal authorities when implementing the Mutual Help Program are substantial; indeed, they can properly be termed as total control." Dewakuku, 226 F. Supp. 2d 1199, 1202. As well, the Court stated that,

> "Tribal housing authorities have never been seen as wholly independent entities under the Mutual Help Program in the realm of home construction. To ensure that the proposed low-income housing met applicable standards, Congress, when it passed the Indian Housing Act, anticipated that HUD would provide the requisite technical and supervisory assistance. Id. at 1202-03 *Citing to* H.R. Rep. No. 100-604 (1988), reprinted in 1988 U.S.C.C.A.N. 791, 796 ("House Report").

The oversight of HUD over tribal housing authorities for Mutual Help Homes extended virtually over everything including site selection, production method and almost every

other aspect of developing Mutual Help Homes. Id. at 1203. In Dewakuku II, the Court ultimately found that HUD had violated the APA by failing to supervise the tribal housing authority and provide the plaintiff with a decent and safe home under the Indian Housing Act.[8] Dewakuku II,. at 1206.

Although HUD might not be a party to the contract between the plaintiff and the Cheyenne River Housing Authority, HUD ought to be held liable for the breach of the contract and any tortious conduct carried out by CRHA, since HUD has such an over whelming control of the local tribal housing authority in developing Mutual Help Homes and administering the MHOA projects. Under Article I of the 1868 Fort Laramie Treaty. the Cheyenne River Housing Authority are "bad men" who are under control of the United States government for Article I purposes, since the Mutual Help Programs are essentially controlled by HUD and federal regulations. The United State government should therefore be liable for not only the specific actions of BIA or HUD agents, but also for the breach of contract and any other tortious conduct carried out by the CRHA in regards to the plaintiff's Mutual Help Home.

CONCLUSION

Based upon the foregoing argument the defendant's motion to dismiss should be denied since the plaintiff has plead that jurisdiction is proper in this court under The

[8] In Dewakuku I, the District Court found that HUD violated the Indian Housing Act and that Dewakuku had a private right of action under the Annual Contributions Contract. Dewakuku v. Cuomo, 107 F. Supp. 2d 1117 (D. Ariz. 2000). However, on the appeal the Court of Appeals for the Federal Circuit overturned the lower Court's ruling and remanded it for a determination of the Administrative Procedures Act claim which the lower Court did not rule upon. Dewakuku v. Martinez, 271 F.3d 1031, 1042 (Fed. Cir. 2001). On remand the lower Court found that HUD did violate the APA by failing to provide safe and sanitary house under the Indian Housing Act. Dewakuk v. Martinez, 226 F. Supp. 2d 1177, 1206 (D. Ariz. 2002).

Tucker Act, 28 U.S.C. 1491 because the plaintiff's claims are based upon Article I of the Fort Laramie Treaty with the Great Sioux Nation. The plaintiff has also plead a claim upon which relief can be granted and thus the defendant's motion should be denied. The plaintiff respectfully requests that this Court deny the defendant's motion and grant what further relief the Court deems just and necessary.

Respectfully submitted by,

s/ Robert J. Doody
ROBERT J. DOODY
Attorney for the Plaintiff
Dakota Plains Legal Services
PO Box 500
Eagle Butte, SD 57625
605-200-1096
robert.doody@gmail.com

January 2nd, 2007

CERTIFICATE OF FILING

I hereby certify that on this 2nd day of January, 2007, a copy of the foregoing "PLAINTIFF RESPONSE TO MOTION TO DISMISS AND BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert J. Doody