# In the United States Court of Federal Claims

No. 06-502 C

(Filed: July 27, 2007)

```
*************************************
YVONNE GARREAUX,                    *
                                    *    Motion to dismiss; breach of lease
                Plaintiff,          *    agreement; "bad men" provision;
                                    *    Article I of the 1868 Fort Laramie Treaty;
        v.                          *    Mutual Help and Occupancy Agreement;
                                    *    Mutual Help Homeownership Opportunity
THE UNITED STATES,                  *    Program; Cheyenne River Housing Authority;
                                    *    Bureau of Indian Affairs; HUD
                Defendant.          *
                                    *
*************************************
```

*Robert J. Doody*, of Dakota Plains Legal Services, Eagle Butte, SD, for Plaintiff.

*Robert E. Chandler*, Trial Attorney, with whom were *Franklin E. White, Jr.*, Assistant Director, *David M. Cohen*, Director, *Peter D. Keisler*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant.

---

**OPINION**

---

**DAMICH**, Chief Judge.

In this case, Plaintiff seeks damages for breach of the lease agreement, which she entered into with a local housing authority and which was supervised by the federal government, and for negligence in administering the lease agreement. The case is currently before the Court for consideration of the government's motion to dismiss for lack of subject matter jurisdiction.[1] For the reasons set forth below, the government's motion is GRANTED.

---

[1] Although the motion was styled as a motion to dismiss for lack of subject matter jurisdiction *and* for failure to state a claim upon which relief can be granted, all of the government's arguments are directed to lack of subject matter jurisdiction and, therefore, the motion will be treated as such.

**I.     Background**

On September 21, 1977, the Cheyenne River Housing Authority ("CRHA") (the local housing authority) entered into a twenty-five year lease agreement with certain Indian heirs of land held in trust for them by the United States, which lease agreement was approved by the Bureau of Indian Affairs ("BIA"). Compl., ex. A. The land consisted of 2.5 acres in Dewey County, South Dakota and was to be used to build a home, with the financial assistance of the Department of Housing and Urban Development ("HUD"), under the provisions of the United States Housing Act of 1937. Compl., ¶ 5-6, ex. A. The home was occupied by one of the Indian family members who entered into the lease agreement. *Id*. ¶ 8. When the occupant of the home failed to make timely payments, the property was turned over to the CRHA to administer as a Mutual Help Home under the auspices of the Mutual Help Homeownership Opportunity Program ("MHHOP") administered by HUD. *Id*. ¶ 10, 12. After the home passed through two different owners, CRHA entered into a Mutual Help and Occupancy Agreement ("MHOA") with Plaintiff, Ms. Yvonne Garreaux, an elderly Indian woman. *Id*. ¶ 15, 17.[2] With the understanding that she would own the home upon completion of the MHOA, Ms. Garreaux took possession of the home in 1992. *Id*. ¶ 18. At the time, the home was in severe disrepair, but the CRHA promised to make repairs to the home. *Id*. ¶ 19-20. In March 2005, the needed repairs were estimated to be about $40,935.40, which amount is approximately equal to the present estimated value of the home itself. *Id*. ¶ 21, 27, 42. Because the baseboard heat was dysfunctional, Ms. Garreaux was forced to heat her home in the winter using the oven stove and eventually installed a wood burning stove. *Id*. ¶ 23-25.

In October 2004, Plaintiff completed her obligations pursuant to the MHOA, excepting the final payment required to transfer the land. *Id*. ¶ 28-29. Just before the CRHA conveyed the home to Ms. Garreaux, the Superintendent at the BIA contacted her and stated that, since HUD no longer had an economic interest in the leased land, the lease was terminated and she had thirty days to leave the premises. *Id*. ¶ 30-31. Thereafter, the CRHA informed the Superintendent that the BIA, and therefore HUD, still had a financial interest in the land because the final payment for conveyance of the home had not been made and there were outstanding repairs not yet completed. *Id*. ¶ 33-34. The Superintendent agreed to continue the lease until such time as the home was conveyed to Ms. Garreaux or the CRHA settled the dispute with Ms. Garreaux concerning the outstanding repairs to the home. *Id*. ¶34.

Between March 2005 and May 2006, CRHA and the Plaintiff tried unsuccessfully to reach an agreement. Compl. ¶ 39-52. Although the CRHA offered to credit Ms. Garreaux the cost of the home plus the cost of the outstanding repairs, the replacement home offered for purchase by the CRHA was valued at more than the total amount of the credit and was located in town rather than in the country. *Id*. ¶ 37, 41-45.

---

[2] Plaintiff alleges that the CRHA has since lost the MHOA. *Id*. ¶ 16.

Ms. Garreaux filed an administrative complaint against the BIA and HUD under the Federal Tort Claims Act in February 2005, but a final administrative determination has not yet been made. *Id*. ¶ 51.

Plaintiff filed her complaint in this Court on July 5, 2006. In the complaint, Plaintiff alleges that the government has committed breach of contract and has committed a wrong under Article I of the 1868 Fort Laramie Treaty by the following: breach of the MHOA, failure to properly administer the MHOA, failure to provide safe, sanitary and healthy living conditions as mandated by the Indian Housing Act, and negligence due to administration and breach of the MHOA. *Id*. at 8-9. Plaintiff requests monetary damages in the amount of $1,350,000. *Id*. at 9.

On December 4, 2006, Defendant filed, in lieu of an answer, the instant Motion to Dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the U.S. Court of Federal Claims ("RCFC").

## II.   Standard of Review

Subject matter jurisdiction may be challenged at any time by the parties, the Court *sua sponte*, or on appeal. *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998); *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993); *United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 998 n.1 (Fed. Cir. 1991). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steele Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, Coldwater & Lake Mich. Ry. v. Swan*, 111 U.S. 379, 382 (1884)). A challenge to the Court's jurisdiction is properly raised by a Rule 12(b)(1) motion. *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999). In deciding Defendant's motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true all of Plaintiff's well-pleaded facts alleged in the complaint, and draw all reasonable inferences in the Plaintiff's favor. *Goodwin v. United States*, 338 F.3d 1374, 1377 (Fed. Cir. 2003); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998). Plaintiff, however, bears the ultimate burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

The jurisdiction of the Court of Federal Claims is "prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Waivers of sovereign immunity "cannot be implied but must be unequivocally expressed." *Fed. Nat'l Mortgage Ass'n. v. United States*, 379 F.3d 1303, 1311 (Fed. Cir. 2004) (citing *United States v. King*, 395 U.S. 1, 4 (1969)). Moreover, waivers of sovereign immunity are to be strictly construed. *Sherwood*, 312 U.S. at 590.

The Tucker Act, 28 U.S.C. § 1491 (2000), constitutes a waiver of sovereign immunity. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The Tucker Act states in pertinent part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or *any Act of Congress* or any regulation of an executive department, or upon *any express or implied contract* with the United States, or for liquidated or unliquidated damages in cases *not sounding in tort*.

28 U.S.C. § 1491(a)(1) (2000) (emphases added). Hence, the Tucker Act grants this Court jurisdiction over claims for money damages against the United States founded either upon an Act of Congress or an express or implied contract. The Court, however, lacks jurisdiction over tort claims. Furthermore, "[t]he Tucker Act . . . is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction . . . whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976). Plaintiff, therefore, must identify another source of law that creates a substantive right and demonstrate that the source of law mandates compensation by the federal government. *Mitchell*, 463 U.S. at 216-17.

**III.    Analysis**

In its motion to dismiss, Defendant argues that the Court lacks jurisdiction over both Plaintiff's claims for breach of contract and Plaintiff's claims under the 1868 Fort Laramie Treaty.[3] Therefore, Defendant urges the Court to dismiss the case.

**A.    Breach of Contract**

Defendant contends that Plaintiff's breach of contract claim, i.e., Plaintiff's claim that the United States is liable for breach of the MHOA, is deficient for two reasons. First, Defendant argues that Plaintiff's claim is defective because Plaintiff has failed to meet the heightened pleading requirement set forth in RCFC 9(h)(3).[4] Defendant contends that Plaintiff's complaint

---

[3] Defendant further asserts, in its motion, that Plaintiff does not allege a regulatory, statutory or constitutional basis for jurisdiction of this Court. Plaintiff does not contest this assertion in her response to Defendant's motion.

[4] RCFC 9(h)(3) provides:
> The complaint shall include: . . .
>    (3) Contracts or Treaties. If the claim is founded upon a contract or treaty with the United States, a description of the contract or treaty sufficient to identify it. In addition, the plaintiff shall plead the substance of those portions of the contract or treaty

4

does not conform with the rule in that she fails to state the portions of the contract upon which she relies and does not attach a copy of the relevant contract to the complaint. Defendant argues that although Plaintiff alleges that HUD breached the MHOA, she does not point to any contract language setting forth an obligation HUD owed Plaintiff that was breached. According to Defendant, Plaintiff's failure to retain or to procure a copy of her contract with the CRHA does not excuse her failure to meet the pleading requirements. Defendant avers that Plaintiff cannot maintain a breach of contract action without the supporting evidence showing the substance of the agreement and, therefore, this Court lacks jurisdiction of Plaintiff's breach of contract claim.

Plaintiff responds to Defendant's motion by arguing, as she stated in her complaint, that the CRHA lost the original MHOA. *See* Compl. ¶ 16.

The rules of the Court of Federal Claims do indeed include a special pleading requirement for claims based on a contract. RCFC 9(h)(3). *See W & D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 647 n.7 (1997); *Tri-State Motor Transit Co. v. United States*, 39 Fed. Cl. 485, 501 (1997). The purpose served by the rule is obvious: In order for the court to render a decision on a breach of contract claim, it must know the relevant terms of the contract. Although one judge has found that the special pleading requirement set forth in RCFC 9(h)(3) need not be met when the claim arises under section 10(a)(1) of the Contract Disputes Act of 1978, this case does not arise under the Contract Disputes Act. *See Info. Sys. & Networks Corp. v. United States*, 64 Fed. Cl. 599, 603 (2005) (finding that because a final decision by the contracting officer had issued, the claim was based on an agency action and therefore the special pleading requirement set forth in RCFC 9(h)(1), not RCFC 9(h)(3), applied). The Court concludes that there is a minimum burden for Plaintiff, in asserting a breach of contract claim, to explicitly identify the provisions and terms of the contract that have been breached. Plaintiff has failed in this regard. Although Plaintiff blames her failure on the negligence of the CRHA in losing the agreement, Plaintiff is notably silent with respect to her own copy of the agreement. The Court need not consider whether a copy of the agreement can possibly be retrieved, however, because the Court finds that there was no privity of contract between Plaintiff and Defendant as discussed further below.

Defendant argues that in order for Defendant to be liable for breach of contract, there must be privity of contract between Defendant and Plaintiff. Here, however, Defendant is not a party to the MHOA, rather CRHA is. Furthermore, Defendant argues, for it to be held liable for the acts of a third party, the third party must be an agency or instrumentality acting within the scope of Defendant's authority in entering the contract. Here, Plaintiff alleges only that HUD supervised CRHA's development, ownership and operation of housing projects. According to Defendant, the performance of regulatory and sovereign functions by an agency does not create contractual obligations for Defendant. Moreover, Defendant's involvement in the financing and

---

on which plaintiff relies or shall annex to the complaint a copy of
the contract or treaty, indicating the provisions thereof on which
the plaintiff relies.

supervision of a contract between an agency and a private party does not create a contract between Defendant and the private party. Defendant cites *New Era Constr. v. United States*, 890 F.2d 1152, 1155 (Fed. Cir. 1989), *Housing Corp. of Am. v. United States*, 468 F.2d 922 (Ct. Cl. 1972), *Eubanks v. United States*, 25 Cl. Ct. 131 (1992), and *DeRoche v. United States*, 2 Cl. Ct. 809 (1983), as precedent establishing that HUD is not liable on contracts entered into by local housing authorities even though HUD exercises control over projects carried out by the housing authorities. Defendant contends that the fact that HUD supervised CRHA's development, ownership and operation of housing projects is not sufficient to establish privity of contract between Plaintiff and Defendant and does not support a breach of contract claim against Defendant.

Plaintiff concedes in her response to Defendant's motion to dismiss that Plaintiff bargained with the local housing authority, CRHA, in entering into the MHOA. Plaintiff contends, however, that the instant case is distinguishable from the cases cited by Defendant because none of the cited cases involve MHOAs with private Indian individuals. Further, in none of the cited cases did HUD have the same degree of involvement with the contract as it does with the MHOA here. According to Plaintiff, HUD was part of and approved the initial lease agreement with Plaintiff and had a greater level of involvement in the project. Plaintiff argues that because Defendant exercised substantial control over CRHA, the party who breached the contract, Defendant is liable for breach of contract.[5] Plaintiff cites to a series of cases, *Dewakuku v. Cuomo*, 107 F.Supp. 2d 1117 (D. Ariz. 2000) (*Dewakuku I*), *Dewakuku v. Martinez*, 271 F.3d 1031 (Fed. Cir. 2001) (*Dewakuku II*), and *Dewakuku v. Martinez*, 226 F. Supp. 2d 1199 (D. Ariz. 2002) (*Dewakuku III*), which are more specifically directed to the liability of HUD to homeowners under the MHHOP. Plaintiff relies in particular on *Dewakuku III*, in which the court found that HUD exercised substantial supervisory power over the Hopi Tribal Housing Authority, nearing total control. Furthermore, Plaintiff points out that the court concluded that HUD had violated the APA by failing in its supervision. Plaintiff argues that similarly, here, HUD ought to be held liable for breach of contract since HUD had overwhelming control over the local housing authority in developing and administering the MHOA projects.

Defendant contends, in its reply brief, that the factual distinctions raised by Plaintiff are irrelevant to the legal basis for Defendant's argument that the Court lacks jurisdiction. First, Defendant notes that whether the local housing authority contracts with a private individual as opposed to a contractor has no bearing on whether the local housing authority is the government's agent, and, contrary to the assertion by Plaintiff, the claims in *Eubanks* and in *DeRoche* were in fact brought by private individuals. Second, Defendant contends that the extent of its control over the local housing authority likewise does not affect whether it can be held liable for actions by the local housing authority and, therefore, Plaintiff's reliance on *Dewakuku III* is misplaced. According to Defendant, in each of the cases cited in its motion, the

---

[5] Plaintiff goes on to argue that because Defendant exercised such control it violated Article I of the 1868 Fort Laramie Treaty. Plaintiff's arguments regarding the Court's jurisdiction based on the Treaty are discussed below.

government exercised substantial control over the local housing authority, yet the government was insulated from liability due to the sovereign nature of its acts. Finally, Defendant asserts that there is simply no basis for Plaintiff's argument that HUD's approval of the MHOA created liability.

Defendant's arguments have merit. The general rule is that in order for a party to sue and recover directly from the United States for breach of contract, there must be evidence of the existence of a contract between the party and the United states, i.e., there must be privity of contract. *Lockheed Martin Corp. v. United States*, 48 Fed. Appx. 752, 756 (Fed. Cir. 2002); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed. Cir. 1983); *United Housing Corp. v. United States*, 217 Ct. Cl. 693, 696 (1978); *Blaze Constr., Inc. v. United States*, 27 Fed. Cl. 646, 648 (1993); *Eubanks v. United States*, 25 Cl. Ct. 131, 137 (1992). The purpose of the privity rule is to avoid potential problems in contract administration and program management that could result from allowing direct claims against the government. *Johnson Control*, 713 F.2d at 1549. Furthermore, there can be no recovery against the United States for an act of a third party unless the third party is an agent of the United States acting within its authority. *Edison Sault Elec. Co. v. United States*, 552 F.2d 326, 333 (Ct. Cl. 1977); *Eubanks*, 25 Cl. Ct. at 138. "The mere fact that the United States participates in the actions of the third party . . . does not establish an agency relationship . . . ." *Edison Sault*, 552 F.2d at 333; *DeRoche*, 2 Cl. Ct. at 812.

It is well established that the federal government will not be held liable for acts performed in its sovereign capacity. *Correlated Dev. Corp. v. United States*, 556 F.2d 515, 522 (Ct. Cl. 1977); *D.R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505, 507 (Ct. Cl. 1967). Waivers of sovereign immunity are to be strictly construed. *Sherwood*, 312 U.S. at 590. The fact that government approval is required does not make the government a party to the contract nor mean that the government has waived its sovereign immunity. *New Era Constr. v. United States*, 890 F.2d 1152, 1154 (Fed. Cir. 1989); *Correlated Dev.*, 556 F.2d at 522; *Housing Corp. of Am.*, 468 F.2d at 924; *D.R. Smalley*, 372 F.2d at 507.

The Court of Appeals for the Federal Circuit ("Federal Circuit") and its predecessor court have made clear that when the federal government subsidizes local government projects, the federal government does not make itself a party to contracts relating to the projects, nor does the local government become an agent of the federal government. *Housing Corp. of Am.*, 468 F.2d at 924; *New Era Constr.*, 890 F.2d at 1154; *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862, 863-64 (1982); *Correlated Dev.*, 556 F.2d at 522; *Nat'l Leased Hous. Ass'n. v. United States*, 32 Fed. Cl. 454, 458 (1994); *Blaze Constr.*, 27 Fed. Cl. at 648; *DeRoche*, 2 Cl. Ct. at 812. As explained by the court in *New Era Constr.* when it held that HUD was not liable for a contract entered into by the Indian Housing Authority of the Sac and Fox Tribe of Missouri:

> The contract here in issue is one of many pursuant to which the Federal Government subsidizes projects of state and local authorities for the public betterment. The United States, however, does not make itself a party to the contracts relating to said projects but obligates

> itself by separate agreements, as here, to local authorities for the funding of those projects it approves. . . . This does not create an express or implied contract between plaintiff and defendant nor does it make the Commission defendant's agent through HUD. HUD's actions were performed in defendant's capacity as sovereign. This principle has been settled for some time . . . .

*New Era Constr.*, 890 F.2d 1152, 1155 (Fed. Cir. 1989) (quoting *Housing Corp. of Am.*, 468 F.2d at 924).

The factual distinctions raised by Plaintiff between this case and the cases cited by Defendant are distinctions without a difference. Whether the plaintiff is a contractor or a private individual has no bearing on the federal government's liability. In fact, the lawsuit in *Eubanks* was brought by a private individual, the lessee. *Eubanks*, 25 Cl. Ct. at 134.

Moreover, neither the federal government's intimate control over a project nor its high degree of involvement is sufficient to create liability. *Marshall N. Dana Constr.*, 229 Ct. Cl. at 863; *Nat'l Leased Hous.*, 32 Fed. Cl. at 458 (1994); *Eubanks*, 25 Cl. Ct. at 137-38; *DeRoche*, 2 Cl. Ct. at 811. "By funding and regulating programs designed for the public good the U.S. is acting in its role as a sovereign and the moneys promised are gifts or gratuities which do not establish any contractual obligation, express or implied, on the part of the United States." *Marshall N. Dana Constr.*, 229 Ct. Cl. at 864 (citing *D.R. Smalley*, 372 F.2d at 507).

The Dewakuku series of cases does not state differently. Serena Dewakuku, like Plaintiff here, was a home buyer under the MHHOP of a home built by the Hopi Tribal Housing Authority under contract with HUD. *Dewakuku I* at 1119. The home contained certain defects, and when Dewakuku's attempts to get the Hopi Housing Authority to correct the defects proved futile, she sued the federal government. *Id*. In *Dewakuku I*, she alleged that (1) the Secretary of HUD violated the Indian Housing Act and its implementing regulations; (2) the Secretary breached his obligations under the Annual Contributions Contract of which Dewakuku was an intended beneficiary; and (3) the Secretary violated the Administrative Procedure Act ("APA") by failing to enforce the standards and perform his duties. *Id*. at 1118. The District Court of Arizona found that the Indian Housing Act created an implied private cause of action against the Secretary of HUD to obtain repairs on substandard housing and that Dewakaku was an intended beneficiary under the Annual Contributions Contract and could sue HUD to enforce its duties under the contract to provide safe, decent, and sanitary housing. *Id*. at 1130, 1134-35. The district court did not decide the APA claim since the relief under the APA claim was deemed to be duplicative of relief the court had already awarded. *Id*. at 1135. In *Dewakaku II*, the Federal Circuit reversed the decision in *Dewakuku I*, finding that the first claim failed because the Indian Housing Act does not expressly or impliedly provide a private right of action and that the second claim failed because the Annual Contributions Contract explicitly excluded claims against HUD by a third party as an intended beneficiary. *Dewakuku II* at 1040, 1042. The Federal Circuit remanded the case to the district court for consideration of the APA claim, which the district court had not

considered earlier. *Id*. at 1042. On remand, the district court determined that HUD had failed to properly supervise the Hopi Tribal Housing Authority and provide Dewakuku with a "decent safe and sanitary" home as it was required to do under the United States Housing Act, 42 U.S.C. §§ 1437a(b)(1) and 1437aa(a) (1994). *Dewakuku III* at 1206. In so doing, the Court held that HUD had violated the APA by acting "not in accordance with law." *Id*. Nevertheless, the Federal Circuit, in *Dewakuku II*, explicitly rejected the argument that there was privity of contract between HUD and the homeowner and that HUD was liable to the homeowner as a third party intended beneficiary. Accordingly, the Court lacks jurisdiction to hear Plaintiff's breach of contract claim.[6]

### B. Fort Laramie Treaty

Defendant next contends that there is no basis for Plaintiff to recover under Article I of the Fort Laramie Treaty of April 29, 1868, between the United States and the Great Sioux Nation. Defendant argues that on its face the Treaty does not support Plaintiff's claims because the Treaty is not money-mandating and does not waive the sovereign immunity of the United States. Therefore, Defendant avers, there is no basis for this Court's jurisdiction under the Treaty. While Defendant acknowledges that 28 U.S.C. § 1505 (2000) confers jurisdiction on this Court to hear claims by Indian tribes pursuant to a treaty, Defendant contends that it does not confer jurisdiction over claims by individuals.[7]

Plaintiff concedes that the Court does not have jurisdiction under 28 U.S.C. § 1505, but argues that such does not limit the Court's jurisdiction under the Tucker Act through the express language of the "bad men" provision of Article I of the Fort Laramie Treaty, which states:

---

[6] Although in *Dewakuku III*, the court found government liability under the APA, no such claim has or can be made here. Under the APA, a suit may be brought "in a court of the United States seeking relief other than money damages . . . ." 5 U.S.C. § 702 (2000); *see Bowen v. Massachusetts*, 487 U.S. 879, 895-901 (1988); *Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974, 985 (9th Cir. 2006). In *Dewakuku III*, the plaintiff asked for equitable relief, i.e., repair or reconstruction by HUD of defects in her home. *Dewakuku III* at 1201. That claim was brought, however, in district court. The Court of Federal Claims lacks jurisdiction over equitable claims.

[7] 28 U.S.C. § 1505 (2000) provides:
> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

> If *bad men* among the whites, or among other people subject to the authority of the United States, shall *commit any wrong* upon the person or property of the Indians, the United States will, upon proof made to the agent, and forwarded to the commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also *reimburse* the injured person for the loss sustained.

Fort Laramie Treaty art. I, April 29, 1868, 15 Stat. 635 (emphases added).  According to Plaintiff, the plain language of the "bad men" provision in Article I provides a private right of action for individual Indians and mandates the payment of money damages pursuant to the term "reimburse"; hence, the provision waives the sovereign immunity of the United States. Moreover, Plaintiff avers that the Indian Canon of Construction requires that treaties be construed liberally.  Therefore, Plaintiff contends that the "bad men" provision should be construed to allow a private right of action by individual Indians against the United States. Plaintiff cites to several cases that support this Court's jurisdiction of claims brought under "bad men" provisions of this or similar treaties, including:  *Tsosie v. United States*, 11 Cl. Ct. 62 (1986) (*Tsosie I*); *Tsosie v. United States*, 825 F.2d 393 (Fed. Cir. 1987) (*Tsosie II*); *Hebah v. United States*, 428 F.2d 1334 (Ct. Cl. 1970) (*Hebah I*); *Hebah v. United States*, 456 F.2d 696 (Ct. Cl. 1972) (*Hebah II*); *Begay v. United States*, 219 Ct. Cl. 599 (1979) (*Begay I*); *Begay v. United States*, 224 Ct. Cl. 712 (1980) (*Begay II*); and *Elk v. United States*, 70 Fed. Cl. 405 (2006).

Plaintiff contends that she has set forth sufficient facts to establish jurisdiction under the Tucker Act.  First, Plaintiff asserts that she is an enrolled Indian with the Cheyenne River Sioux Tribe residing on the Cheyenne River Reservation and, thus, she is a beneficiary under the 1868 Fort Laramie Treaty with the Great Sioux Nation.  Second, Plaintiff asserts that agents at the BIA and HUD failed to properly administer the land lease and the MHOA causing Plaintiff to lose her home; hence, they are "bad men" within the scope of the Fort Laramie Treaty.  Third, because the Treaty covers "any wrong" committed against the Indians, the tortious conduct of the BIA and HUD officials and the breach of the MHOA are both actions covered by the Treaty.  Finally, Plaintiff argues that the Treaty provides for monetary relief by the federal government for damages caused to an Indian person or property.  Therefore, Plaintiff asserts that this Court has jurisdiction over her claims.

Defendant, in its reply brief, avers that Plaintiff has misinterpreted the phrases "commit any wrong" and "bad men" in her construction of Article I.  Defendant contends that although the term "wrong" is not defined in the Treaty, its meaning can be deciphered from the context in which it is used in Article I and from cases interpreting the term.  It is a basic canon of construction that the meaning of a term should be interpreted based on its context.  According to Defendant, Article I requires that if "bad men" commit a "wrong," they are to be "arrested and punished."  Thus, Defendant urges that "wrong" is necessarily limited to criminal acts, since the perpetrator of non-criminal acts could not be arrested and punished.  In a similar vein, Defendant argues that treaties, like statutes and contracts, are to be interpreted so as not to render one part

10

inoperative or meaningless; yet, to interpret "wrong" to include non-criminal acts would render the "arrested and punished" language to be meaningless. Defendant asserts that the cases cited by Plaintiff support this interpretation of the term "wrong." According to Defendant, in each of the cases, the "wrong" that was committed was a crime, either a sexual assault or a wrongful death. Finally, Defendant contends that in interpreting the phrase "commit any wrong," the Court should look to the plain meaning of the phrase. Defendant contends that the Webster dictionary definition for "commit" is "to carry into action deliberately" and the definition for "wrong" is "an injurious, unfair or unjust act." Therefore, Defendant avers that one cannot commit a wrong through inaction. According to Defendant, in order for Plaintiff to state a claim pursuant to the Treaty, Plaintiff must allege that she was the victim of a crime, or at least allege that the perpetrator engaged in some affirmative act. Because she does not, Defendant avers that her claim under Article I of the Treaty must fail. Even if the phrase "commit any wrong" can be interpreted to encompass inaction, Defendant asserts that Plaintiff has failed to allege specific facts showing a failure to act, or a negligent act, by someone. Instead, Plaintiff's allegations are general allegations of tortious conduct or failure to properly administer. Defendant contends that Plaintiff has not identified the people she believes are "bad men" within the meaning of the Treaty nor has she alleged facts showing that they are bad men. Defendant points out that in *Hebah II* the court made independent determinations whether a wrong was committed and whether the perpetrator was a bad man. Here, Defendant avers, Plaintiff has not stated the names of the people who perpetrated wrongs against her, nor has she alleged facts to show that they are bad men under the Treaty. Defendant argues that such conclusory allegations unsupported by specific factual assertions should not withstand a motion to dismiss.

Both the Federal Circuit and its predecessor court have found Tucker Act jurisdiction over claims brought under Article I of similar Indian treaties. *Tsosie II* at 395 (holding that the Claims Court has jurisdiction under the Tucker Act over claim brought under Article I of the 1868 Treaty between the United States and the Navajo Tribe); *Begay I* at 600 (holding that Court of Claims has jurisdiction under the Tucker Act over claim brought under Article I of the 1868 Treaty between the United States and the Navajo Tribe); *Hebah I* at 1335, 38-39 (holding that the Court of Claims has jurisdiction under the Tucker Act over claim brought under Article I of the Treaty between the United States and the Eastern Band of Shoshonees and the Bannack Tribe). As explained in *Hebah I*:

> [O]n its face 28 U.S.C. § 1491—our basic jurisdictional charter—would seem to give us power to hear and decide this individual claim. Unlike § 1505, that broad statute is not limited as to the class of plaintiffs who may sue, and Mrs. Hebah's case is founded either upon an "Act of Congress" (if the treaty can be so characterized) or, at least, upon an "express or implied contract with the United States," i.e. Article I of the 1868 Treaty. Nothing in the terms or structure of [section] 1491 precludes our jurisdiction.

*Id*. at 1338-39.  Article I "bad men" provisions appear in substantially similar form in nine treaties between the United States and Indian tribes.  *Tsosie II* at 395; *Brown v. United States*, 32 Ct. Cl. 432, 435 (1897); *see*, *e.g.*, *Begay I* at 600 ("bad men" provision in Treaty between the United States and the Navajo Tribe); *Hebah I* at 1335 ("bad men" provision in Treaty between the United States and the Eastern Band of Shoshonees and the Bannack Tribe).  Given the similar language in Article I among the various Indian treaties, there is little doubt that this Court has jurisdiction of a proper claim brought under the "bad men" provision of Article I of the Fort Laramie Treaty of April 29, 1868, between the United States and the Great Sioux Nation.  *See Elk v. United States*, 70 Fed. Cl. 405, 405-07 (2006) (finding jurisdiction under the Tucker Act over a claim brought under Article I of the 1868 Treaty between the United States and the Sioux Tribe); *Zephier v. United States*, No. 03-768L, at 2-3, 8, 13-14 (Fed. Cl. Oct. 29, 2004) (finding jurisdiction under the Tucker Act over a claim brought under Article I of the 1868 Treaty between the United States and the Sioux Tribe, but dismissing for failure to exhaust administrative remedies).  The Court, therefore, must only decide whether Plaintiff's claim falls within the reach of the "bad men" provision of Article I of the 1968 Fort Laramie Treaty.

      Each of the Indian treaties in fact contain two "bad men" clauses.  *Tsosie II* at 398.  In addition to the one quoted above ("white 'bad men' provision"), which provides a remedy for wrongs committed by white men against Indians, there is another "bad men" clause which provides relief for wrongs committed by Indians ("Indian 'bad men' provision").  *Id*.  In the 1968 Fort Laramie Treaty, the Indian "bad men" provision reads as follows:

> If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws; and in case they willfully refuse so to do, the person injured shall be re-imbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States.

Fort Laramie Treaty art. I, April 29, 1868, 15 Stat. 635.  The primary object of this provision was to require the Indians to deliver up wrongdoers for trial and punishment under the laws of the United States and, if the Indians failed to do so, to allow the injured person to be compensated for his loss.  *Friend v. United States*, 29 Ct. Cl. 425, 429 (1894).  Together, the purpose served by the two "bad men" provisions working in concert was to keep the peace between the white men and the Indians.  *Janis v. United States*, 32 Ct. Cl. 407, 410 (1897).  After all, the nine treaties with the Indians were a significant accomplishment.  The thirteen tribes who entered into the nine treaties with the United States "were the great and warlike and dominant powers of the Indian race then existing on this continent . . . ."  *Brown*, 32 Ct. Cl. at 435.  The court in *Brown* explained:  "The making of the treaties was apparently the institution of a new Indian policy . . . a

policy which would tend to weed out the worst criminals among the Indians and stamp in their estimation depredations as crimes." *Id*. at 436.  With respect to the Indian "bad men" provision, the court, in an earlier opinion, reasoned:

> In civilized communities the law simply seeks to punish crime, and the consequences of crime have to be borne by the citizens.  To the court it seems evident that the purpose of this treaty was to bring these Indians a step nearer to civilization; to encourage them in treating crime as crime; to weed out the worst Indians of a tribe; to place before all of its members the terrors of the white man's punishment—imprisonment or the gallows—and to break up the Indian practice of sheltering criminals and paying for their depredations.

*Brown v. United States*, 32 Ct. Cl. 411, 415 (1897).[8]  It would seem that the complementary white "bad men" provision should be read similarly, i.e., the primary intent of both "bad men" provisions was to guard against affirmative criminal acts, primarily murder, assault, and theft of property.  *See Ex parte Kan-gi-shun-ca*, 109 U.S. 556, 567-68 (1883).  Such an interpretation would mesh with the requirement set forth in the white "bad men" provision that the offender "be arrested and punished," terms reserved for the criminal context.  In *Hebah II*, the court established that at least two inquiries are required to determine whether a claim fits within the "bad men" provision: (1) whether the man is a bad man in the sense of the treaty; and (2) whether he committed a wrong within the meaning of the treaty.  *Hebah II* at 704.  The court went on to define "wrong" using the dictionary definition:  "Action or conduct which inflicts harm without due provocation or just cause; serious injury wantonly inflicted or undeservedly sustained; unjust or unmerited treatment."  *Id*. (citing Webster's New Int'l Dictionary (3d ed. 1968)).

In each of the cases cited by the parties, the claim was based on an affirmative criminal act.  In *Tsosie*, the plaintiff was a patient at the United States Public Health Service Hospital on the Navajo reservation.  *Tsosie II* at 397.  She claimed that she was the victim of a sexual assault by a hospital laboratory technician posing as a doctor.  *Id*.  In *Hebah*, the plaintiff filed suit for the wrongful death of her husband, shot by an Indian Police Force officer on the Shoshone reservation.  *Hebah I* at 1336 & n.2.  In *Begay*, the claims were brought by Indian girls for sexual assault by white and Indian teachers at a boarding school on the Navajo reservation.  *Begay I* at 600 & n.1.  Finally, in *Elk*, the suit was brought by a woman alleging that she was sexually assaulted by an U.S. Army recruitment officer on the Sioux reservation.  *Elk v. United States*, 70 Fed. Cl. 405, 405-06 (2006).  Other cases rooted in the "bad men" provision of Article I of an Indian treaty have similarly been criminal in nature.  *See Ex parte Kan-gi-shun-ca*, 109 U.S. 556, 557 (1883) (murder); *Janis v. United States*, 32 Ct. Cl. 407, 408 (1897) (killing of cattle); *Friend*

---

[8] While this 1897 commentary of the court contrasting "civilized" and Indian society is archaic and offensive, the opinion is still useful in clarifying the purpose and meaning of the "bad men" provision.

*v. United States*, 29 Ct. Cl. 425, 426 (1894) (stolen property); *Herrera v. United States*, 39 Fed. Cl. 419, 420 (1997) (assault); *Zephier v. United States*, No. 03-768L, at 2 (Fed. Cl. Oct. 29, 2004) (sexual, physical and mental abuse).

      Here, in contrast, Plaintiff is asking the Court to stretch the bounds of the "bad men" provision to encompass not a criminal claim, but a claim for negligence and/or breach of contract, and to encompass not a claim against specified white men, but against the federal government or HUD as an entity or against unnamed HUD officials. This the Court will not do. Plaintiff has not alleged sufficient facts stating who the "bad men" are, much less showing that they qualify as "bad men" under the Treaty. Moreover, Plaintiff has not alleged facts stating that a "wrong" was committed within the meaning of the Treaty. Although it is true that the Court is to construe treaties liberally, resolving ambiguities in favor of the Indians, the Court cannot rewrite or expand treaties beyond their clear terms to remedy a claimed injustice. *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943); *Herrera v. United States*, 39 Fed. Cl. 419, 421 (1997). Because the Court finds that the claims asserted by Plaintiff do not fall within the confines of the "bad men" provision of Article I of the Fort Laramie Treaty of April 29, 1868, between the United States and the Great Sioux Nation, the Court concludes that it lacks jurisdiction over the claims.[9] Plaintiff's claims must, therefore, be dismissed.

## IV.    Conclusion

      Defendant's Motion to Dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is GRANTED. The Clerk of the Court is directed to dismiss the complaint with prejudice.

                                                                                     s/ Edward J. Damich
                                                                                    EDWARD J. DAMICH
                                                                                    Chief Judge

---

[9] Moreover, as correctly noted by Defendant, several of Plaintiff's claims made under Article I of the Treaty sound in tort. In addition to there being no jurisdiction over those claims under the Treaty, there is no jurisdiction over those claims outside of the Treaty because tort claims are specifically excluded from the Court of Federal Claims Tucker Act jurisdiction. 28 U.S.C. § 1491(a)(1) (2000); *see Eubanks v. United States*, 25 Cl. Ct. 131, 139 (1992).